**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4321

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DAVID WILLIAM SMITH,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, District Judge.  (1:18-cr-00115-MR-WCM-1)

Submitted:  May 6, 2020                                              Decided:  June 16, 2020

Before WILKINSON and FLOYD, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Floyd joined.  Senior Judge Traxler wrote an opinion concurring and concurring in the result in part.

Howard W. Anderson III, LAW OFFICE OF HOWARD W. ANDERSON III, LLC, Pendleton, South Carolina, for Appellant.  R. Andrew Murray, United States Attorney, Anthony J. Enright, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

Following a two-day trial, a jury in the Western District of North Carolina found appellant David William Smith guilty of possession with intent to distribute more than 50 grams of methamphetamine, along with simple possession of a smaller quantity. On appeal, Smith advances several claims that he says warrant a retrial. Only one has merit: We agree with Smith that the district court erred in permitting the government to deviate from the order of closing arguments prescribed in Rule 29.1 of the Federal Rules of Criminal Procedure. The court's decision to allow the government to waive its initial closing argument—yet retain the opportunity to rebut Smith's—violates the letter and spirit of that Rule, inasmuch as it impairs a defendant's ability to rebut the government's arguments in the prescribed manner. Nevertheless, we hold that this error did not prejudice Smith in light of the overwhelming evidence supporting the jury's guilty verdict. With respect to the other issues raised, we find no error, and accordingly affirm the judgment of the district court.

I.

A.

On August 21, 2017, Angela Johnson called the Swain County Sheriff's Department to report "yelling and screaming" coming from a trailer on her property. J.A. 190. While she waited for the police to arrive, Johnson stood on her front porch. At some point, the shouting stopped and Johnson saw appellant David Smith exit the trailer and walk toward a Chevrolet Tahoe parked in the driveway, where a small crowd of people had gathered. Johnson looked on as Smith placed a black purse under the Tahoe's front bumper and

2

retrieved a clear box with "white powder" from underneath the vehicle's rear. *Id.* at 191-92. Before Smith put the box back, he hollered, "Does anybody else out here want any?" *Id.* at 193.

Patrol Sergeant Doug Woodard arrived on the scene soon after. He spoke to Smith, who was accompanied by his friend Jessica McCoy. Smith identified the Tahoe as his and gave Woodard permission to search it. During his search, Woodard located the black purse and clear box, which were magnetically attached to the Tahoe's underbody. The purse contained more than $2,000 in cash, and the box held roughly 11 grams of methamphetamine. Woodard also found electronic scales and a few Ziploc "baggies" in the car. J.A. 215. He then arrested Smith.

A few weeks later, Woodard once again crossed paths with Smith, who was out on probation. On September 4, while in his patrol car, Woodard saw a white minivan with no license plate tag drive past him. He immediately activated his blue lights and pursued the vehicle, which "just wasn't pulling over." J.A. 230-31. Other officers came to assist. When the car finally stopped, they began to approach it on foot. As they did so, the officers saw Smith behind the wheel and McCoy in the passenger's seat. After receiving Smith's consent, they searched the vehicle and found a small amount of a "crystal-like substance" in the driver's side area as well as a red lock box underneath the passenger's seat. *Id.* at 234. They later obtained a warrant to search the box, and discovered that it contained approximately 51 grams of methamphetamine and a "large number" of unused Ziploc baggies. *Id.* at 276. The officers also recovered $453 in cash. *Id.* at 288-89.

On September 18, 2018, when Jefferson B. Sessions served as Attorney General, a grand jury in the Western District of North Carolina returned a two-count indictment against Smith based on the events in August (Count I) and September (Count II). Both counts charged Smith with possessing methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). But they alleged different quantities of methamphetamine—a "detectable" amount with respect to the first count (the trailer park incident) and more than 50 grams as to the second (the pullover). J.A. 9. Smith was arrested the following day.

About two months later, Sessions resigned as the Attorney General and the President designated Matthew Whitaker the Acting Attorney General. He did so pursuant to the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349d, which authorizes the President to make temporary appointments to positions requiring Senate confirmation, *id.*, § 3345(a)(3). As explained further below, Smith soon moved to dismiss his indictment on the ground that even though Whitaker's designation was statutorily valid, the FVRA was in contravention of the Appointments Clause, U.S. Const. Art. II, § 2, cl. 2. The district court denied Smith's motion. Specifically, it reasoned that the FVRA was not unconstitutional, and also that Smith had failed to show any prejudicial impact of Whitaker's tenure as Acting Attorney General on Smith's conviction in the Western District. J.A. 89.

B.

Smith's case proceeded to trial in January 2019. The jury heard from several government witnesses, including Angela Johnson, Sergeant Woodard, and Jessica McCoy.

4

McCoy, who identified herself as a methamphetamine addict, confirmed that she had accompanied Smith during both of the events in question. She said that she and Smith drove to Johnson's property in August because Smith needed to "pick up some money from somebody." J.A. 292. As for the September incident, McCoy recalled that Smith had purchased the lock box and minivan the day before Sergeant Woodard pulled them over. After showing McCoy the contents of the box, the government asked her to estimate how long the quantity of drugs inside of it would last her. She replied that the box had enough "crystal meth" to supply her "forever"—a "good four months, five." *Id.* at 311-12.

Most relevant to this appeal, the government also offered testimony from Officer Brian Leopard, who had examined the drugs, baggies, and scales seized from Smith's vehicles. Leopard—a Sheriff's Deputy and task force officer with the United States Drug Enforcement Administration—told the jury that he had participated in more than 1,500 drug-related investigations over the course of 26 years in law enforcement. Over Smith's objection, the district court permitted Leopard to draw upon this experience to opine on the use of baggies and scales in drug-related conduct. In denying Smith's objection to Leopard's appearance as a lay witness, the court noted that a law enforcement officer ordinarily need not be qualified as an "expert" to talk about what he has learned from his "[ac]cumulated experience." J.A. 258.

With this go-ahead, Leopard testified that a connection exists "between scales and controlled substances" and "between drugs and baggies of the shape and size" of those that had been found with Smith. J.A. 220-21, 269. Leopard went on to explain that if drug customers purchased "a gram, or a couple of grams" of drugs, the "size of bag" recovered

in this case "is what we would generally see it in." *Id.* at 270. As for the scales, he remarked that "if you're going to be buying you want to make sure that you're getting what you paid for." *Id.* at 271. Finally, Leopard said a few words about typical user amounts of methamphetamine. He explained that new users do not need "as much to get that high"—maybe "a tenth of a gram"—whereas longtime users have difficulty "get[ting] that original high" and use "more and more" in an attempt to do so. *Id.* at 272.

During cross-examination, Smith asked Leopard if part of the police work that informed his testimony included suspect interrogations and debriefings. Leopard answered yes. J.A. 283. Smith then moved to strike all of Leopard's prior testimony on the ground that it impermissibly contained testimonial hearsay in violation of the Sixth Amendment's Confrontation Clause. Here too, the court overruled the objection. In so doing, it noted that Smith had not shown that Leopard was simply parroting the disputed statements or that those statements were "absolutely central" to the opinions he provided on direct examination based on his accumulated personal experience. See *id.* at 284-85.

After the prosecution rested its case, Smith did not call any witnesses on his behalf. The day before closing arguments, the government indicated that it wished to make only one closing statement rebutting Smith's. Smith vigorously objected to this proposal, pointing out that the Federal Rules of Criminal Procedure contemplate an established order where the government delivers an initial closing as well as a rebuttal responding to the defendant's closing. See J.A. 359. Accordingly, Smith requested the court to rule that "if the government waives opening then it also waives its right to have a rebuttal." *Id.* at 357-58. The court, however, rejected Smith's request, reasoning in part that denying the

6

government its final closing would be inappropriate in light of the fact that it carries the burden of proof at trial. *Id.* at 355-56, 358.

During his closing, Smith conceded that he possessed methamphetamine on both August 21 and September 4, but he denied any intent to distribute it. J.A. 367, 374. Among other things, Smith insisted that there is nothing unusual about "buy[ing] in bulk as a drug user" because taking multiple trips to buy drugs is "dangerous" and "if you get a volume discount, great." *Id.* at 371-72. For its part, the government emphasized that police officers recovered drug distribution tools on both occasions, but they did not find any instruments of personal drug use such as pipes or rolling papers. With regard to the September episode, the government also underscored that Smith had with him "dozens of bags" and, as McCoy noted, enough methamphetamine to supply an experienced user for months. *Id.* at 378-80.

The jury returned a partial acquittal on January 9, 2019. On Count I, Smith was convicted only of the lesser-included offense, simple possession. As for Count II, the jury found him guilty as charged. A few months later, the district court sentenced Smith to 36 and 77 months in prison for Counts I and II, respectively. By this time, Whitaker was no longer the Acting Attorney General and William P. Barr was serving as Attorney General, having been nominated by the President and confirmed with the advice and consent of the Senate.

On appeal, Smith argues that a retrial is required for three reasons. First, he argues that Matthew Whitaker's designation as Acting Attorney General was unconstitutional and that his trial during Whitaker's tenure was accordingly defective. Second, Smith avers that

Leopard's testimony about bags, scales, and typical user amounts of methamphetamine did not qualify as lay opinion and that its introduction also violated the Confrontation Clause. And third, Smith maintains that the government should have lost its opportunity to deliver a rebuttal closing argument when it chose not to make an initial one.

## II.

We begin with Smith's constitutional challenge, which we review de novo. *United States v. Bollinger*, 798 F.3d 201, 207 (4th Cir. 2015). All parties agree, as they must, that Matthew Whitaker's designation as Acting Attorney General was authorized by the Federal Vacancies Reform Act. 5 U.S.C. § 3345(a)(3).[1] But Smith claims that even if the President had the statutory power to name Whitaker to that post, the FVRA was in violation of the Appointments Clause. And if Whitaker's tenure was unconstitutional, Smith tells us, then everything carried out by the Justice Department under his watch (including Smith's

---

[1] Smith concedes that if the FVRA applies, then there is no statutory problem with Whitaker's designation. But for the first time, Smith now suggests that the FVRA may not have been available here because 28 U.S.C. § 508 (AG Act) should be construed as the exclusive succession statute for the office of the Attorney General. And under that Act, Smith continues, the Deputy Attorney General (not Whitaker) was supposed to have taken over. This is wrong. As other courts have held, agency-specific succession statutes (like the AG Act) ordinarily supply an alternative to the FVRA, but not a mutually exclusive one, absent clear text to the contrary. See, *e.g.*, *Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 555-56 (9th Cir. 2016); see also S. Rep. No. 105-250, at 17 (1998) (stating the FVRA "would continue to provide an alternative procedure [to agency-specific statutes] for temporarily occupying" a vacant office). After all, when Congress wants the FVRA not to apply, it says so. See, *e.g.*, 5 U.S.C. § 3349c; 6 U.S.C. § 113(g). But the AG Act offers no hint that Congress tried to displace the FVRA; in fact, every indication points the other way. *Guedes v. Bureau of Alchohol, Tobacco, Firearms, and Explosives*, 356 F. Supp. 3d 109, 138-44 (D.D.C. 2019) (analyzing the text and structure of the two statutes).

8

prosecution for dealing methamphetamine in North Carolina's Western District) was inescapably tainted. Smith thus says he is owed a retrial.

We disagree. The President's designation of Whitaker as the Acting Attorney General was constitutional—a conclusion that is plainly compelled by both longstanding Supreme Court precedent as well as centuries of unbroken historical practice. To boot, even if Smith's constitutional argument were right, he still would not be entitled to the relief he seeks, for Smith has failed to show in any discernible fashion how Whitaker's designation affected the validity of Smith's proceeding or prejudiced him in any way. In short, we affirm the district court's decision on this score and, in so doing, join every court that has assessed the constitutional claim Smith raises here. See *United States v. Castillo*, 772 Fed. App'x 11, 13 n. 5 (3d Cir. 2019) (collecting cases).

Article II's Appointments Clause divides all constitutional officers into two classes: "inferior officers" and noninferior officers (who are referred to as "principal officers"). *United States v. Germaine*, 99 U.S. (9 Otto) 508, 511 (1878).[2] Principal officers must be appointed by the President with the advice and consent of the Senate. *Edmond v. United States*, 520 U.S. 651, 660 (1997). Inferior officers may be appointed in the same manner,

---

[2] The full text of the Appointments Clause provides that the President

"shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II, § 2, cl. 2.

9

but doing so is not constitutionally required. *Id.* Instead, should it so choose, Congress may authorize the President alone to appoint inferior officers without the advice and consent of the Senate. See U.S. Const. Art. II, § 2, cl. 2.

The Attorney General is undoubtedly a principal officer who must be appointed by the President and confirmed by the Senate. See *Edmond*, 520 U.S. at 662-63. Smith's claim here turns on whether an *Acting* Attorney General holds the same constitutional status. If an Acting Attorney General is a principal officer, as Smith insists he is, then Whitaker's designation would have been unlawful, and the FVRA would be unconstitutional as-applied because it would have improperly provided for a non-Senate-confirmed person to serve as a principal officer. But if an Acting Attorney General is an inferior officer, then Whitaker's designation would be free of any constitutional infirmity since Congress may "by Law vest the Appointment of such inferior officers" "in the President alone." U.S. Const. Art. II, § 2, cl. 2. We hold that Whitaker's designation complied with the Appointments Clause. Someone who temporarily performs the duties of a principal officer is an inferior officer for constitutional purposes, and accordingly may occupy that post without having been confirmed with the advice and consent of the Senate.

The Supreme Court's decision in *United States v. Eaton*, 169 U.S. 331 (1898) settles this issue. There, Sempronius Boyd, then-Consul to Siam (and a Senate-confirmed principal officer), had fallen ill and Lewis Eaton, a general vice consul (and a non-Senate-confirmed inferior officer), was named to temporarily replace him as Consul. For reasons not relevant here, Eaton later found himself in litigation with Boyd's estate over

10

Eaton's salary (and what might have gone to Boyd's widow)—a question that necessarily involved whether Eaton had been constitutionally designated the acting Consul to Siam.

The Court held that Eaton's temporary service as Consul was consistent with the Constitution, even though he was not appointed to that post by the President with the advice and consent of the Senate. See *Eaton*, 169 U.S. at 343-44. Specifically, the *Eaton* Court held that when a "subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official." *Id.* at 343. Focusing on both the Constitution's structure as well as decades of executive branch practice, the *Eaton* Court reasoned that holding otherwise "would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duty of a superior officer, and the discharge of administrative duties would be seriously hindered." *Id.* at 343-44.

So much so here. The FVRA sets specific time limitations and other conditions on the tenure of acting department heads. See 5 U.S.C. § 3346; see also *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 935-37 (2017). In other words, an Acting Attorney General under the FVRA is "only charged with the performance of the duty of the superior for a limited time and under special and temporary conditions," *Eaton*, 169 U.S. at 343, and is thus an inferior officer under *Eaton*.[3] Smith urges that we should essentially treat *Eaton* as a relic—as a

---

[3] To be sure, it is possible that a statute may authorize an acting tenure so lengthy that it exceeds the "special and temporary conditions" contemplated by *Eaton*, and amounts instead to a circumvention of the Appointments Clause. *SW General*, 137 S. Ct. at 946 n.1 (Thomas, J., concurring). But that is not this case, where Whitaker held his post for only a few months, well within the FVRA's initial 210-day clock. See *NLRB v. Noel Canning*,

11

case, in his words, that was decided "before the airplane," Appellant's Op. Br. at 22—and nonetheless hold that the FVRA is unconstitutional insofar as it permits non-Senate-confirmed persons to serve as acting principal officers.   Of course, we can do no such thing, for what Smith is really asking us to do is not only hold unconstitutional an Act of Congress, but to overrule *Eaton*'s binding holding.

*Eaton* stands for the basic principle that *acting* heads of departments are not principal officers because of the temporary nature of the office.  The Supreme Court has consistently reaffirmed this rule.  See  *Edmond*, 520 U.S. at 661; *Morrison v. Olson*, 487 U.S. 654, 672-73 (1988) (holding the independent counsel was an inferior officer because, in large part, his post was only "temporary") (citing *Eaton*, 169 U.S. at 343).  Lower courts, naturally, have as well.  See, *e.g.*, *United States v. Hilario*, 218 F.3d 19, 29 (1st Cir. 2000) ("Of course, an inferior officer can stand in for a principal officer.").

None of this should be surprising because *Eaton* is congruous with centuries of unbroken historical practice.  The Supreme Court has often stressed that when it comes to cases involving structural constitutional provisions like the Appointments Clause, history matters.  See *Noel Canning*, 573 U.S. at 524; *The Pocket Veto Case*, 279 U.S. 655, 688 (1929).  And the history here points in one direction. "Since President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office [i.e., an office requiring

---

573 U.S. 513, 600 (2014) (Scalia, J., concurring in the judgment); see also E. Garrett West, *Congressional Power Over Office Creation*, 128 Yale L.J. 166, 217-18 (2018).

12

Presidential appointment and Senate confirmation] without first obtaining Senate approval." *SW General*, 137 S. Ct. at 935. Taken as true, Smith's position on the FVRA would ultimately mean that these congressional authorizations harbored repeated constitutional defects and that Congress has gotten the Appointments Clause quite wrong for centuries. That is ordinarily a pretty bad sign. See *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 327-28 (1936) (recognizing a "legislative practice" that is "marked by the movement of a steady stream for a century and a half of time" often constitutes "an unassailable ground for the constitutionality of the practice"). Especially so here, where Smith's position would find him at immediate odds with the Constitution's drafters. For the first general vacancy statute, passed by the Second Congress, "authorized the appointment of '*any person or persons*' to fill vacancies in the Departments of State, Treasury, and War." *SW General*, 137 S. Ct. at 935 (quoting Act of May 8, 1792, ch. 37 § 8, 1 Stat. 281) (emphasis added). Put plainly, that Act—just like the FVRA—permitted non-Senate-confirmed persons to serve temporarily as acting principal officers.

At heart, Smith is asking for a revolution in Appointments Clause jurisprudence. Indeed, for his position to succeed, clear Supreme Court precedent, scores of federal laws, and hundreds of past executive branch designations would all have to fall. In light of the above, we find the FVRA a permissible exercise of congressional authority under the sound rule laid down by *Eaton* and in turn reject Smith's constitutional claim.

Finally, we are mystified as to exactly what the connection is between the appointment of which Smith complains and his right to a fair trial. Even if he has it right, and all three branches of government have had it wrong since the Founding, Smith would

13

still not be entitled to the relief he seeks. At bottom, Smith has cited no authority—nor could he—for his root-to-branch theory that as long as Whitaker's tenure as Acting Attorney General was unlawful, then the integrity of his federal prosecution in the Western District of North Carolina was *necessarily* marred. See *Castillo*, 772 Fed. App'x at 14 n.6 (collecting cases rejecting this position); see also *Ryder v. United States*, 515 U.S. 177, 182-83 (1995). Rather, Smith must show that Whitaker's tenure somehow affected his proceeding and prejudiced him in some way. Yet Smith can do no such thing.

For starters, Smith's indictment was valid in every respect. First, he was prosecuted by the United States Attorney for the Western District of North Carolina, who was Senate-confirmed and who was independently empowered by statute to "prosecute . . . all offenses against the United States." 28 U.S.C. § 547(1). Second, nobody contests that federal law authorized Smith's prosecution and that the district court had jurisdiction over it. 18 U.S.C. § 3231; see also *United States v. Plesinski*, 912 F.2d 1033, 1038 (9th Cir. 1990). And third, Smith was charged pursuant to an indictment issued by a properly constituted grand jury. See *Costello v. United States*, 350 U.S. 359, 409 (1956) (A facially valid "indictment returned by a legally constituted and unbiased grand jury . . . is enough to call for trial of the charge on the merits."); see also *United States v. Williams*, 504 U.S. 36, 47-48 (1992).

In light of the above, we cannot dismiss Smith's indictment, or order a new trial, without some indicia that Smith was prejudiced by Whitaker's tenure as the Acting Attorney General. See *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988). But Smith cannot make this showing. In fact, he has not provided a single concrete example of how Whitaker affected or influenced his criminal proceeding in any manner.

14

*United States v. Smith*, 2018 WL 6834712, at \*4 (W.D.N.C. Dec. 28, 2018) (Smith "is unable to point to *any* prejudice—real or imagined—that is created by Whitaker's designation as Acting Attorney General."). As such, we affirm the district court here, and reject Smith's request for a retrial on this ground.

III.

A.

Smith next claims that the district court improperly admitted Officer Leopard's testimony. He contends that Leopard's remarks about drug quantities and paraphernalia should not have been admitted as lay opinions under Federal Rule of Evidence 701. Instead, he tells us, the district court should have examined their admissibility under Rule 702's rubric for expert testimony. In essence, Smith avers that Leopard's reliance on his past experience as a police officer took his testimony outside the realm of lay opinion and into the territory of an expert. And because Leopard was offering expert testimony, Smith maintains that the government was required to disclose his testimony to the defense prior to trial and that the district court should have fashioned appropriate relief to address this error—such as granting Smith a continuance to obtain a counter-expert.

Under Rule 701, a lay witness may only offer an opinion that is "rationally based on [his] perception." Fed. R. Evid. 701(a). By contrast, to offer an opinion "based on scientific, technical, or other specialized knowledge," the witness must first be qualified as an expert under Rule 702. *Id.* at 701(c). The line between lay and expert testimony "is a fine one." *United States v. Roe*, 606 F.3d 180, 185 (4th Cir. 2010) (quotation omitted). Under our case law, if a witness's firsthand observations are "common enough" and require

15

applying only a "limited amount of expertise," they may fairly come in under Rule 701 as lay testimony. *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) (quotation omitted). On the other hand, opinions resulting "from a process of reasoning which can be mastered only by specialists in the field" must be admitted through Rule 702. *United States v. Howell*, 472 F. App'x 245, 246 (4th Cir. 2012) (quoting Fed. R. Evid. 701 advisory committee notes).

In all events, whether certain testimony falls under which Rule is a classic evidentiary call for which a federal trial court is afforded a good deal of discretion. *United States v. Farrell*, 921 F.3d 116, 145 (4th Cir. 2019). To that end, the district court's ruling here must stand unless it has acted "arbitrarily or irrationally." *Id.*

A review of Leopard's testimony makes clear that it met Rule 701's core requirements. For one, Leopard's testimony was essentially observational and "based on personal knowledge." *Perkins*, 470 F.3d at 155-56. Indeed, it is well-settled that "experience-derived police testimony concerning criminals' typical *modi operandi* during a drug transaction" may qualify as lay opinion under Rule 701. *United States v. Page*, 521 F.3d 101, 105 (1st Cir. 2008) (allowing agent's testimony that narcotics traffickers usually have "burly individuals" accompany them during drug deals "to provide protective countersurveillance against police drug stings"); see also *United States v. Williams*, 212 F.3d 1305, 1309 (D.C. Cir. 2000) (permissible for officer to testify that it is common for drug traffickers to carry weapons for protection); *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995) (same); *United States v. Hoston*, 728 F. App'x 223, 224 (4th Cir. 2018) (officer could opine that the substance he saw on the floor of the defendant's residence was

16

methamphetamine).

The testimony in this case is similar in kind. Leopard's statements, like the examples we have described, were grounded in his firsthand observations. For instance, he commented that he had seen dealers use the size and type of bag found with Smith to distribute "a gram, or a couple of grams" of drugs. J.A. 270. And he noted that it was common, in his experience, for buyers to weigh the drugs they planned to purchase with a scale such as was located in Smith's vehicle. *Id.* at 270-71. To be sure, Leopard's remarks were based on his decades-long law enforcement career. That, however, does not make them any less observational for purposes of Rule 701. As the district court recognized, we have repeatedly allowed officers to bring to bear their accumulated experience when testifying as lay witnesses. *Id.* at 258. A case in point is that of *United States v. Roe*, where we held that an officer in charge of a firearms licensing unit could, "based on his personal knowledge acquired in that capacity," testify about what authority permitholders do and do not have. 606 F.3d 180, 185-86 (4th Cir. 2010); see also *Perkins*, 470 F.3d at 156-57 (upholding admission of officers' testimony that the force they saw being used to arrest someone was reasonable in light of their "particularized experience as police officers").

In short, Officer Leopard's testimony was plainly based on his own "perception." Fed. R. Evid. 701(a). Moreover, that perception did not turn on the application of any "specialized knowledge." Fed. R. Evid. 702(a). Take what Leopard said about the use of Ziploc bags in narcotics transactions. In the main, he noted that bag size may indicate the type or weight of the drug being sold. J.A. 270 ("You have larger bags, of course, larger weights . . . [and] some drugs you don't need as much so you don't need as big a bag.").

17

Consider also his comments on the use of digital scales: "[I]f you're going to be buying you want to make sure that you're getting what you paid for." *Id.* at 271. Obviously, such statements touch on facts within the jury's reach. Said otherwise, they call more for the exercise of common sense than expertise.

All told, we cannot say that it was an abuse of discretion to allow Leopard to offer his lay opinions. To repeat, the district court enjoys wide latitude when determining whether to admit a witness's statements under Rule 701 or 702. There is no indication that the trial court went too far here. On the contrary, Leopard's remarks bear all the hallmarks of a permissible lay opinion; not only are they observational in nature, they also result from a process of reasoning that is less the product of specialized or academic training than the stuff of everyday life. See *Perkins*, 470 F.3d at 155-56.

There was thus no error here, and even if there were it would be harmless. A trial court's wrongful admission of opinion testimony under Rule 701 is harmless if the same testimony could have been offered under Rule 702 in the first instance. *Perkins*, 470 F.3d at 156-57. Here the government could readily have qualified Leopard as an expert, as courts routinely admit similar police officer testimony. See, *e.g.*, *United States v. Monu*, 782 F.2d 1209, 1210-11 (4th Cir. 1986) (upholding admission of agents' expert opinion testimony regarding heroin distributor's use of scales); *see also United States v. Gastiaburo*, 16 F.3d 582, 589 (4th Cir. 1994) (noting that "expert testimony on the *modus operandi* of criminals is commonly admitted, particularly regarding the methods of drug

18

dealers") (internal quotation marks and quotation omitted).[4]

We are confident too that the admission of Leopard's testimony did not affect the outcome of Smith's trial in any way. That is because the independent evidence that Smith intended to distribute drugs on September 4 was overwhelming. On that date, police officers recovered approximately 51 grams of methamphetamine—hidden in a lock box— from an unlicensed van that Smith was driving. The officers also found a "large number" of unused Ziploc baggies and $453 in cash. J.A. 274-76, 288-89. We think it is doubtful, in light of this hard evidence, that the jury misjudged the character of Smith's operations. Moreover, the testimony at trial provided still more evidence of his intent to distribute. Tellingly, his friend McCoy (who was the passenger in his van) testified that 51 grams was enough drugs to supply an experienced user like herself for "a good four months, five." *Id.* at 311-12. And, when asked to ballpark the going price for this quantity, she said "[p]robably a thousand" dollars. *Id.* We cannot say, then, that Leopard's comments had any cognizable impact on the jury's verdict.

---

[4] Smith does not dispute that Leopard's remarks were admissible under Rule 702. According to him, Leopard's testimony was problematic regardless because he had no notice of it prior to trial, and he therefore did not have the opportunity to obtain a counter-expert. See Fed. R. Crim. Pro. 16(a)(1)(G) (requiring government to provide defense with "written summary" of expert testimony during discovery). That argument, however, does not move the needle in Smith's favor, because he does not even hint at anything a counter-expert could have said that would have made a difference. See *United States v. Smith*, 701 F.3d 1002, 1008 (4th Cir. 2012).

B.

Having rejected Smith's first challenge to Leopard's testimony, we now consider his Confrontation Clause claim, which we review de novo. *United States v. Mouzone*, 687 F.3d 207, 213 (4th Cir. 2012). Smith avers that Leopard's remarks were based on statements that Leopard had heard during police interrogations or official debriefings—statements that are considered "testimonial" hearsay under the Confrontation Clause. Appellant's Op. Br. at 43 (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). And because Smith did not have the opportunity to cross-examine the declarants of those statements, he argues that their admission violated his Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Taking a fly in the ointment approach, Smith then maintains that *all* of Leopard's testimony was therefore tainted because it was partially premised on inadmissible hearsay.

We disagree. Leopard's testimony plainly did not relay testimonial hearsay to the jury. As the district court noted, Leopard spoke on the basis of his learned experience in the aggregate. Suspect interrogations and debriefings, none of which even had anything to do with Smith's case, were just "one small slice" of that experience. J.A. 286. Indeed, Leopard's 26 years as a law enforcement officer also included "investigations, prosecutions, hard evidence, observations, and so on." *Id.* at 285. Moreover, at trial, Leopard did not describe a single statement that he had heard during earlier investigations, but rather drew on what he had generally learned over the course of his entire law enforcement career. See *id.* at 268-72. Put otherwise, Leopard was not merely "parroting" outside statements or repeating what he had overheard in some interrogation room, as

20

opposed to offering insight gleaned from decades of policework—and Smith has given us absolutely no reason to think otherwise. Accordingly, like the district court, we find Smith's Confrontation Clause claim to be without merit.

IV.

Finally, Smith argues that he is entitled to a retrial because the government failed to make an initial closing argument and instead chose to deliver only a rebuttal argument following Smith's closing. Specifically, he claims that under Rule 29.1 of the Federal Rules of Criminal Procedure, the district court should have ruled that the government waived its rebuttal argument when it chose not to make an initial closing.

In Smith's view, this conclusion follows from Rule 29.1's text and purpose. To begin with, the Rule sets out a defined order for closing arguments: "(a) the government argues; (b) the defense argues; and (c) the government rebuts." Fed. R. Crim. P. 29.1. The thrust of this text, Smith says, is to *require* the government to go first. That is because the "fair and effective administration of justice is best served if the defendant knows the arguments actually made by the prosecution in behalf of conviction before the defendant is faced with the decision whether to reply and what to reply." Fed. R. Crim. P. 29.1 advisory committee notes. Although the Rule does not spell out what happens if the government does not deliver an initial closing, Smith argues that a waiver of its rebuttal is the natural consequence. As support, he notes that the House Judiciary Committee, in adopting the proposed Rule, took just that view. See *id.* judiciary committee notes.

Of course, the district court is generally "afforded broad discretion in controlling closing arguments and is only to be reversed when there is a clear abuse of its discretion."

21

*United States v. Baptiste*, 596 F.3d 214, 226 (4th Cir. 2010) (quotation omitted). But such discretion, while broad, is not limitless. Rule 29.1 is clear as to how closing arguments shall proceed, and it thus cabins the district court's latitude in a discrete but important way. See *United States v. Cardascia*, 951 F.2d 474, 485 (2d Cir. 1991) ("Aside from controlling the order of appearances in the closing arguments, inasmuch as the prosecution must go first, Rule 29.1 does not limit the discretion of the trial judge whose obligation it is to ensure a fair and orderly procedure in the closing arguments to the jury.").

Adhering to the prescribed sequence of closing arguments is not just a matter of good housekeeping. Doing so provides each side in a criminal case a meaningful opportunity to rebut the other, much as with the orderly progression of arguments in appellate briefing. To borrow from the Supreme Court, "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975). Moreover, "no aspect of such advocacy could be more important than" what is at issue here—"the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Id.*

Rule 29.1 tracks these core principles. As Smith points out, its purpose is to preserve a defendant's final opportunity to respond to the prosecution's case in an informed manner. See *United States v. Fields*, 429 F. App'x 343, 345 (4th Cir. 2011) (citing Fed. R. Crim. P. 29.1 advisory committee notes). What the government did in this case, however, undermined that vital function. To permit the prosecution to waive its initial closing, yet retain the opportunity to rebut, upsets the fundamental structuring of the Rule and leaves

22

defendants like Smith with no opportunity (in the absence of a sur-rebuttal) to meaningfully respond to what the government has said. Rather than authorize that perverse result, we endorse the House Judiciary Committee's view that "the prosecutor, when he waives his initial closing argument," ordinarily "also waives his rebuttal." See Fed. R. Crim. P. 29.1 judiciary committee notes. As such, we hold that it was an abuse of the district court's discretion to permit the government's altered order to go forward over Smith's vigorous objection.

This conclusion is bolstered by the case law of other circuits. Time and again, courts have frowned upon de facto departures from Rule 29.1's order of arguments that unfairly frustrate a defendant's ability to confront the prosecution's case. See, *e.g.*, *United States v. Yakobowicz*, 427 F.3d 144, 152-53 (2d Cir. 2005) (holding that the prosecution's use of argumentative interim summations after each of its witnesses testified violated Rule 29.1 because it "enable[d] the prosecution to argue repeatedly the merits of its theory of the case" before closing arguments); *United States v. Taylor*, 728 F.2d 930, 937 (7th Cir. 1984) (recognizing that "a prosecutor cannot use rebuttal to put forth new arguments, but is restricted to responding to the points made by the defense counsel in closing argument"); see also *United States v. Wood*, 175 F.3d 1018 (4th Cir. 1999) (district court abused its discretion by permitting the government to "simply end-run Rule 29.1" by presenting a key argument for the first time in rebuttal).

The same holds here. Intentional or not, when the government waives its initial argument, it has the effect of "sandbag[ging]" the defendant by setting him up to avoid a subject in his closing argument, only to learn that it is too late to reply to the prosecution's

23

side of the story.  See *Waters v. State*, 974 A.2d 858 (Del. 2009) (applying this logic to hold that, under a state rule of criminal procedure patterned after federal Rule 29.1, the government's waiver of its initial closing constituted a waiver of its rebuttal).  Even the government—which is no stranger to pointing out the ills of sandbagging—seems to recognize the error in the approach it took here.  Indeed, it concedes that the "better practice is to adhere to the order of arguments that Rule 29.1 specifies,"  Appellee's Br. at 40, and has represented that prosecutors in the Western District of North Carolina have since been instructed to follow the Rule's order of operations, *id.*  We think this corrective course is well-advised.

Often it is best never to say never, so we need not hold that deviation from the Rule 29.1 sequence is never justified.  In some circumstances, defense counsel may judge it in the best interest of his or her client for the government to make only one closing argument, albeit the last one.  Therefore, if the defendant consents to the government's waiver of its initial closing, it follows that the defendant waives his right to later object to or appeal the government's departure from Rule 29.1's order.  However, where, as here, the defendant does object to the government's failure to open, we again make clear that the government ordinarily also waives its rebuttal.  In that case, a defendant's objection highlights the evil that may ensue from the altered order of closing arguments—the possibility that the government may use its waiver of an initial closing to shield its argument from rebuttal while exposing the defendant's to attack.

Smith is not entitled, however, to a retrial unless the government's failure to deliver an initial summation actually prejudiced him.  See *United States v. Ollivierre,* 378 F.3d

24

412, 417 (4th Cir. 2004), *vacated on other grounds by Ollivierre v. United States,* 543 U.S. 1112 (2005). He tries to make this showing by arguing that he was unable to respond to the prosecutor's argument that he intended to distribute the drugs found with him, rather than use them personally, because, as the prosecution put it, police never recovered from his vehicles any "instruments of [personal] drug use" (i.e., pipes or rolling papers). See J.A. 377-78. Had the government made this point initially, Smith suggests, he "could have argued" that he was "transporting the drugs home for him to use, where the necessary equipment" for his personal use "may have been." Appellant's Op. Br. at 35.[5]

That is not enough to show prejudice. As an initial matter, Smith never asked the district court for the opportunity to make a sur-rebuttal. He could, of course, have done so; defendants routinely request supplemental rebuttals to respond to new arguments made by the prosecution. See *United States v. Jackson*, 852 F.3d 764, 776 (8th Cir. 2017). Given that practice, Smith's grievance seems to come rather late in the game. Finally, as we have already noted, the evidence of Smith's intent to distribute methamphetamine on September 4 was overwhelming. To recapitulate: Police officers recovered months-worth of

---

[5] Smith also argues that it was impermissible for the prosecution to comment during its closing about his silence when Sergeant Woodard confronted him with the drug paraphernalia found in his truck on August 21. See J.A. 382 ("Did he stand up and scream and say that's not mine . . . No."). As support, he cites *Doyle v. Ohio*, which held that it violates due process "to call attention to [a defendant's] silence at the time of arrest." Appellant's Op. Br. at 36 (quoting 426 U.S. 610, 617-19 (1976)). But that rule is inapposite here, for Smith's silence occurred prior to his arrest and receipt of *Miranda* warnings. See *Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993) ("[T]he Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest or after arrest if no *Miranda* warnings are given.") (citations omitted).

methamphetamine from Smith's car along with hundreds of dollars in cash and numerous baggies that are ordinarily used for distributing drugs. It seems plain, then, that the jury would have returned the same verdict irrespective of the Rule 29.1 error.

## V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

TRAXLER, Senior Judge, concurring and concurring in the result in part:

I concur in Parts I-III of Judge Wilkinson's opinion. And while I concur in the result of Part IV, I write separately to set out my views on the closing-argument issue.

Rule 29.1 sets out the order for closing arguments in criminal cases: "(a) the government argues; (b) the defense argues; and (c) the government rebuts." Fed. R. Crim. P. 29.1. This is obviously the normal and preferred sequence, but courts have recognized that some deviations are permissible. *See, e.g.*, *United States v. Garcia*, 94 F.3d 57, 63 (2d Cir. 1996) (noting that the district court has discretion in appropriate cases to permit the defendant to make a rebuttal closing argument); *United States v. Cardascia*, 951 F.2d 474, 485 (2d Cir. 1991) (finding no error in the district court's decision to permit defense rebuttal). Nonetheless, the government points us to no authority permitting it to waive its initial argument over the objection of the defendant.[1]

In this case, the defendant made a timely objection to the Government's waiver of its initial argument. As we have explained, the district court erred by overruling this objection – if the defendant objects, the government must follow the sequence set out in Rule 29.1. The question, then, is whether Smith was prejudiced by that error.

When determining whether the error was harmless, context is important. During the trial the defendant called no witnesses. When defense counsel made his closing argument, he announced for the first time to the court and to the jury that he was conceding

---

[1] As noted in the majority opinion, there may be circumstances where counsel believes the defendant's best interest would be served by the government's waiver of its opening argument.

27

guilt of simple possession of methamphetamine and contesting only the more serious charges of possessions with intent to distribute. The jury ultimately accepted his argument as to one of the two charges and found Smith guilty of only simple possession on Count I.

On appeal, Smith argues that he was prejudiced by the Government's waiver of initial argument because the Government inappropriately commented on his silence when it argued to the jury that Smith did not deny ownership of the drugs and money Sergeant Woodard found when he searched Smith's car after being called to the scene by Angela Johnson. I see no merit to this argument. First of all, Smith did not object to this argument, and nothing about the order of closing arguments prevented him from doing so. More importantly, however, given Smith's decision not to contest his possession of methamphetamine, his complete silence at the scene was irrelevant to the issue the jury had to decide, which was whether Smith intended to distribute the drugs he admittedly possessed.

Pointing to the Government's jury argument about the absence of any personal-use paraphernalia when Smith was arrested, Smith contends that the sequence of closing arguments permitted the Government to make what amounted to an improper rebuttal argument. Smith argues that if the Government had proceeded first and argued that the absence of such paraphernalia showed an intent to distribute, he would have been able to counter that point by arguing that drug users do not travel with their pipes and other equipment, but keep them where they use the drugs. Although Smith could perhaps have mitigated the power of the Government's argument had the proper sequence been followed, that does not suffice to establish prejudice and require reversal. The jury *agreed* with Smith

28

as to Count I, finding him guilty only of *possession* of the drugs found during the incident on Angela Johnson's property. While the jury did find Smith guilty of possession with intent to distribute on Count II, the jury's verdict on Count I shows that the improper argument sequence did not prevent the jury from fully considering Smith's defense.

Although the district court erred by rejecting Smith's objection and permitting the Government to waive its initial closing argument, the particular circumstances of this case convince me that the error was harmless. I therefore concur in the result of Part IV of the opinion, and fully concur in the remainder of the opinion.