**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-4726**

_____

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

VALENTINO CABRAL DAROSA,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:21−cr−00008−RJC−DSC−1)

_____

Argued:  January 25, 2024                    Decided:  May 16, 2024

_____

Before DIAZ, Chief Judge, and NIEMEYER and WYNN, Circuit Judges.

_____

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion in which Judge Niemeyer and Judge Wynn joined.

_____

**ARGUED:**  Samuel Bayness Winthrop, WINTHROP & GAINES MESSICK, PLLC, Statesville, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:** Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

_____

DIAZ, Chief Judge:

Valentino Darosa was convicted of Hobbs Act robbery and related offenses. On appeal, he challenges the district court's denial of his motion to suppress, failure to give his proposed jury instruction, and admission of certain testimony. He also challenges the sufficiency of the evidence. Finding no reversible error, we affirm.

I.

A.

Matthew Schipani is the owner and operator of Atlantic Metals Xchange, a Charlotte-based store that buys and sells metals, coins, jewels, and currency notes. Though Schipani is the sole employee, he allows his brother-in-law, Joseph Dillulio, to use the space for his own jewelry repair business.

On October 23, 2020, Schipani was at the store before it opened when he saw a man in a black mask and gloves at the door. The man was writing in a small, black notebook. When Schipani greeted him, the man asked Schipani whether he lived at a certain address—one that Schipani recognized as like Dillulio's, but in the wrong city. Schipani told him no, and the man responded that it "must be the other guy." J.A. 159. After Schipani asked him what he wanted, the man pulled out a gun, brought him into the store, handcuffed him, and duct taped his wrists and ankles together. He forced Schipani to open two safes and took several items. He also took Schipani's backpack, which held his firearm and wallet.

2

After the robber left, Schipani went to a neighboring store to call the police. One of the responding officers, Jeremy Anderson, found a roll of duct tape and a black notebook at the scene, which didn't belong to Schipani and weren't there before the robbery. Anderson had the notebook tested for fingerprints, which revealed Darosa's fingerprint on the page containing the address the robber read to Schipani.

Anderson retrieved a photo of Darosa[1] and determined, based on surveillance footage from a neighboring store and Schipani's description, that Darosa resembled the robber. Anderson then searched DMV records and learned that a silver Infiniti was registered to Darosa. And through the City of Charlotte's license-plate reader technology, he found photos of Darosa's vehicle. In an October 28th photo, the vehicle was silver, but a November 4th photo showed the vehicle painted black.

Officers arrested Darosa on November 5. The same day, Anderson applied for a warrant to search Darosa's vehicle and residence. The affidavit stated:

> The defendant left a notebook at the incident scene and it was seized as evidence. Fingerprints were lifted from the notebook and the defendant was identified as Valentino Darosa. Multiple warrants were issued for Darosa relating to this robbery incident.

J.A. 36. A state magistrate judge approved the warrant.

In Darosa's vehicle, officers found black latex gloves, a note with the names of three jewelry businesses, and a receipt from an autobody shop for a "color change," dated five

---

[1] Anderson didn't say where he got the photograph, but it most likely came from police records.

3

days after the robbery. They also found several pieces of currency matching what was taken from the store.

In the apartment Darosa shared with his girlfriend, Levisha Johnson, officers found a pair of handcuffs and two firearms. The serial number on one of them matched Schipani's firearm that was in his backpack when it was stolen. Officers also found a check for $15,558 made out to Johnson from Piedmont Gold Exchange and Refinery, dated eleven days after the robbery.

## B.

Darosa was indicted on one count of Hobbs Act robbery under 18 U.S.C. § 1951, one count of brandishing a firearm during a crime of violence under 18 U.S.C. § 924(c), and one count of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1).

Darosa moved to suppress the evidence seized during the search of his vehicle and home on the ground that the search warrant affidavit failed to establish probable cause. The district court denied the motion, finding that Darosa's fingerprint on the notebook was "probative to suspect him as the robber," *United States v. Darosa*, No. 3:21-cr-008, 2021 WL 3940382, at *3 (W.D.N.C. Sept. 2, 2021), and that the probable cause standard doesn't require an affiant to "rule out all innocent explanations for suspicious facts," *id.* at *2 (quoting *United States v. Blakeney*, 949 F.3d 851, 860 (4th Cir. 2020)).

## C.

At trial, the government called more than a dozen witnesses. Along with recounting the incident, Schipani testified that neither the notebook nor the roll of duct tape belonged to him. The government presented evidence connecting Darosa to both: his fingerprint on

4

the notebook and his DNA on the roll of duct tape. Schipani also identified the items found in Darosa's home and vehicle as those stolen from his store. And the owner of Piedmont Gold Exchange and Refinery testified that Johnson sold him several gold coins on November 3, which Schipani identified as having been stolen during the robbery.

The government introduced Darosa's cell phone data into evidence. One week before the robbery, the phone traveled three times from the area of Darosa's apartment to the area near Schipani's store. Three days before the robbery, the phone traveled from the area of Darosa's apartment to the area near where Dillulio lives. During the time of the robbery, the phone remained near Darosa's apartment but missed five incoming calls, and no outgoing calls were made until shortly after the time of the robbery.

The government also presented evidence suggesting that Darosa was keeping stolen property in a storage unit. An employee of American Store & Lock testified that Darosa rented a storage unit the day after the robbery. In a series of recorded jail calls, Darosa directed Johnson to "American." S.A. 017. He instructed her to pick up his "furniture," but she resisted, telling him to "[s]top playing with [her] freedom." S.A. 021–22. Darosa persisted, saying that he was "forcing" Johnson to retrieve his things so that he could "just sit back and relax" and "not worry about a motherfucking lick ever in [his] life again." S.A. 031.

After Johnson reported that she did everything he asked, Darosa told her to "bag the bread" and give "25 to Phil."[2] *See* S.A. 013, 034–35. In one call, Darosa also asked

---

[2] It's not clear who "Phil" refers to, although the government suggested at trial it was Darosa's boss.

whether the police "got a hammer" during the search of their shared apartment. S.A. 013. Johnson replied, "Yes. Mine, too." S.A. 013. She also reported that the police found "[t]he check," which was "not good." S.A. 013.

Detective Zackery Hagler testified about these recordings. Hagler had fourteen years' experience with the Charlotte-Mecklenburg Police Department, including six years as a robbery detective. He had also been the primary detective in over 350 robberies. Still, the government didn't certify him as an expert.

Hagler testified that, based on his training and experience, "hammer" is code for firearm, "lick" is code for robbery, and "bread" is code for money or proceeds.

### D.

Darosa asked the district court to instruct the jury about the weight it should assign to the fingerprint and DNA evidence. His proposed instruction would have told the jury to use "caution" in evaluating that evidence because it is "highly questionable" absent evidence that Darosa's DNA or fingerprint "could have been impressed *only* during the commission of the crime." S.A. 062 (cleaned up).

The district court declined to give the instruction, stating that it was "a matter of argument for the parties." J.A. 729. The district court did, however, instruct the jury to draw "such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience." J.A. 860. "In other words," the district court clarified, "you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in the case." J.A. 860.

6

The jury returned a guilty verdict on all counts.  This appeal followed.

## II.

Darosa first contends that the district court erred in refusing to suppress the evidence obtained during the searches of his home and vehicle.  We review the district court's legal conclusions on a motion to suppress de novo and factual findings for clear error.  *United States v. Orozco*, 41 F.4th 403, 407 (4th Cir. 2022).

## A.

The Fourth Amendment requires that search warrants be supported by probable cause.  U.S. Const. amend. IV.  The probable cause standard isn't a high one, requiring only a "fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  This is a lesser burden than even the preponderance of the evidence standard.  *United States v. Ortiz*, 669 F.3d 439, 444–45 (4th Cir. 2012).

When reviewing a search conducted with a warrant, we afford "great deference" to the judicial officer who issued it, *Orozco*, 41 F.4th at 407, and ask only whether the officer had a "substantial basis" for finding probable cause, *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018) .

## B.

In light of these principles, we're satisfied that the district court properly denied the motion to suppress.

Anderson's affidavit in support of the search warrant explained that (1) the victim's store was robbed, (2) the robber "left a notebook" at the scene, and (3) a fingerprint on the notebook matched Darosa's prints. J.A. 36. It also explained that, based on Anderson's experience, the stolen items could be difficult to sell and thus may still be in the robber's possession. Finally, the affidavit noted that stolen items are often kept in a person's vehicle or home. We think this provided at least a "substantial basis" for finding probable cause.

Darosa protests that the probative value of his fingerprint on a moveable object at the crime scene is questionable absent other evidence connecting the object to the crime. And he's right to an extent. In a series of cases, we've acknowledged that the probative value of fingerprints on moveable objects without more is limited where there isn't evidence about when the fingerprints were made. *See, e.g.*, *United States v. Strayhorn*, 743 F.3d 917, 923 (4th Cir. 2014) (collecting cases). Those cases articulate a commonsense principle: The fact that a person's fingerprint is on a moveable object at a crime scene isn't particularly strong evidence of guilt, as there can be any number of innocent explanations for how the fingerprint got there.

But we think the principle is inapt here. The cases applying it all concerned whether the evidence was sufficient to *convict*. *See, e.g.*, *United States v. Corso*, 439 F.2d 956, 957–58 (4th Cir. 1971) (per curiam) (vacating a conviction where the "most damaging evidence" was a matchbook cover with the defendant's fingerprints that was found at the crime scene); *United States v. Van Fossen*, 460 F.2d 38, 40–42 (4th Cir. 1972) (vacating a conviction where three thumbprints on movable objects at the crime scene were the sole evidence incriminating the defendant); *Strayhorn*, 743 F.3d at 923–24 (vacating a

8

conviction in which the defendant's fingerprint was found on a roll of duct tape at the crime scene because the other evidence wasn't sufficiently incriminating to connect him to the crime).

It's no surprise that this type of evidence isn't enough to satisfy the much higher "beyond a reasonable doubt" standard. But the same isn't true when considering probable cause. We've repeatedly stated that potential innocent explanations don't defeat probable cause. *See, e.g.*, *Orozco*, 41 F. 4th at 408.

Moreover, the affidavit here connected Darosa's fingerprint to the *crime*, not just the crime *scene*. Recall that the affidavit stated that the robber "left a notebook at the incident scene," and that "[f]ingerprints were lifted from the notebook" and matched Darosa's thumbprint. J.A. 36. Under these circumstances, we think the state magistrate judge had a "substantial basis" for finding probable cause.

## C.

Even if the affidavit didn't establish probable cause for the search warrant, the evidence was admissible under the good-faith exception. When a search is conducted pursuant to a subsequently invalidated warrant, the fruits of that search are admissible so long as the officers acted in objectively reasonable reliance on the warrant. *See United States v. Leon*, 468 U.S. 898, 922 (1984). On this record, we don't think the warrant was "so lacking in indicia of probable cause as to render [the officers'] belief in its existence entirely unreasonable." *Id.* at 923.

Bolstering this conclusion is the other information that Anderson knew but didn't put in the affidavit. *See United States v. Thomas*, 908 F.3d 68, 73 (4th Cir. 2018) (holding

9

that we may consider facts known to the officer but omitted from the affidavit when analyzing whether the good-faith exception applies); *Leon*, 468 U.S. at 922 n.23 (explaining that courts may consider "all of the circumstances" in determining whether the good-faith exception applies).

For example, Anderson had seen security camera footage from a neighboring store and saw the robber writing in a notebook. He knew that the robber had asked Schipani whether he lived at a certain address and that Darosa's fingerprint was found on the same page of the notepad containing this address.[3]  And he knew that Darosa had his car painted from silver to black a few days after the robbery. Though it would have been better to include this information in the affidavit, Anderson's knowledge of it confirms our view that reliance on the search warrant was objectively reasonable.

Nor did the affidavit mislead the magistrate judge by stating that "[*t*]*he defendant* left a notebook at the incident scene." J.A. 36 (emphasis added). *See Leon*, 468 U.S. at 923 (explaining that the good-faith exception doesn't apply when the affiant knowingly or recklessly misleads the magistrate). We think it sufficiently clear that Darosa was identified as the suspect by his fingerprint. Indeed, the affidavit states that "[f]ingerprints

---

[3] Anderson didn't expressly testify to knowing this.  But it's obvious from his testimony that he knew.  He testified that he submitted the fingerprint request and "got the response."  J.A. 526.  He explained that the police department has a "reporting system" which would give him a "notification for a case," and once he clicked on it, he could "look at the lab requests and see what response came back."  J.A. 527.  And he "learned that the right thumbprint of Mr. Darosa was on the notepad."  J.A. 527.  And of course, the right thumbprint was found on the page with the address.  J.A. 364; S.A. 003–05.

were lifted from the notebook and the defendant was identified as Valentino Darosa." J.A. 36.

That the affidavit could have been written more clearly provides no basis for reversal. *Cf. United States v. Zelaya-Veliz*, 94 F.4th 321, 335–36 (4th Cir. 2024) (warning that courts should not rely on a "hypertechnical, rather than a commonsense, interpretation of the warrant affidavit" (cleaned up)).

## III.

Next, we consider whether the district court erred in failing to give the jury Darosa's requested instruction. We review such a challenge for abuse of discretion. *United States v. Ravenell*, 66 F.4th 472, 480 (4th Cir. 2023), *cert. denied*, No. 23-638, 2024 WL 1607762 (U.S. Apr. 15, 2024) (mem.).

## A.

Darosa asked the district court to give this instruction:

> The government has introduced evidence of DNA on a roll of duct tape, and evidence of a partial fingerprint on a small hand-held notepad. Both these items, the duct tape and the notepad, are easily movable objects, and therefore you should use caution when weighing this evidence because the "probative value of an accused's fingerprints [or DNA] upon a readily movable object is highly questionable, unless it can be shown that such prints could have been impressed *only* during the commission of the crime."

S.A. 062 (citing *Strayhorn*, 743 F.3d at 922 (quoting *Corso*, 439 F.2d at 957)).

A district court's refusal to give a requested instruction constitutes reversible error only if the instruction (1) was correct; (2) was not substantially covered by the instructions the court gave; and (3) dealt with some point in the trial so important, that failure to give

11

the requested instruction seriously impaired the defendant's ability to conduct his defense. *Ravenell*, 66 F.4th at 481.

B.

We see no error in the district court's failure to give the instruction, for two reasons.[4]

First, the proposed instruction wasn't correct. It relied in part on our 1971 decision in *Corso* where we said that the probative value of fingerprints on moveable objects is highly questionable "unless it can be shown that such prints could have been impressed *only* during the commission of the crime." 439 F.2d at 957 (emphasis added). But we've since clarified that the evidence need not exclude all other reasons for the presence of a fingerprint.

Only a year after *Corso*, we said that the jury "must be able to reasonably infer from the circumstances that the fingerprints were impressed at the time the crime was committed." *Van Fossen*, 460 F.2d at 41 (cleaned up). And most recently in *Strayhorn*, we summarized these cases as holding that "in challenges to convictions involving fingerprints on movable objects, in the absence of evidence regarding when the fingerprints were made, the government must marshal sufficient additional incriminating evidence so as to allow a rational juror to find guilt beyond a reasonable doubt." 743 F.3d at 923. Because we don't require that the government prove that fingerprints could have been

---

[4] The district court declined to give the instruction on the ground that "it's a matter of argument for the parties." J.A. 729. But we may affirm on any ground apparent in the record, including theories not relied upon by the district court. *United States v. Davis*, 94 F.4th 310, 318 (4th Cir. 2023).

imprinted *only* during the commission of a crime, Darosa's requested instruction wasn't accurate.

In any event, we think Darosa's concern was "substantially covered," by instructions the court gave.

Darosa's instruction goes to the commonsense point we discussed earlier: that a person's fingerprint on a moveable object at a crime scene doesn't necessarily implicate the person's involvement in the crime. On that point, the district court instructed the jury to draw reasonable inferences from the evidence as justified "in the light of common experience." J.A. 860. We think this general instruction "substantially covered" Darosa's preferred instruction. *Cf. Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 540 (4th Cir. 2000) (finding no error in giving a similar "common experience" instruction rather than a requested instruction that the jury in a trademark case could "infer intent not to resume use from a prolonged period of non-use"). *See also United States v. Angiulo*, 897 F.2d 1169, 1207–08 (1st Cir. 1990) (finding that general instructions about the jury's duty to assess credibility "substantially covered" the requested instruction to consider prior inconsistent statements in weighing a witness's testimony); *United States v. Ayala-Carrillo*, 62 F. App'x 557, No. 02-50680, 2003 WL 1202787, at *1 (5th Cir. 2003) (per curiam) (finding that a similar "common experience" instruction "substantially covered" a defendant's requested instruction that "general nervousness alone" isn't enough to prove guilty knowledge).

The district court didn't abuse its discretion in declining to give the requested instruction.

13

IV.

A.

We next consider whether the district court erred in allowing Detective Hagler to offer purported expert testimony as a lay witness. We review such evidentiary rulings for abuse of discretion. *United State v. Roe*, 606 F.3d 180, 185 (4th Cir. 2010).

B.

Recall that Hagler testified about the meaning of coded language Darosa used in recorded jail calls. Hagler testified that "bread" referred to money, "hammer" referred to a firearm, and "lick" referred to a robbery.

Darosa contends that this testimony was inadmissible because Hagler wasn't qualified as an expert. But we're satisfied that any error was harmless.

The wrongful admission of expert testimony is harmless "if the same testimony could have been offered under Rule 702 in the first instance." *United States v. Smith*, 962 F.3d 755, 768 (4th Cir. 2020) (cleaned up). And in the context of coded drug language, "courts of appeals have routinely held that law enforcement officers with extensive drug experience are qualified to give expert testimony on the meaning of drug-related code words." *United States v. Wilson*, 484 F.3d 267, 274–75 (4th Cir. 2007) (cleaned up); *accord United States v. Campbell*, 851 F. App'x 370, 376–77 (4th Cir. 2021) (finding an expert's testimony about his experience sufficient to deduce his expert methodology).

We see no reason to chart a different path here, and Darosa doesn't meaningfully dispute that Hagler could've been qualified as an expert. Hagler had served as a police officer for more than fourteen years, including six years as a robbery detective. He was

14

the primary detective in over 350 robberies and participated in "probably a thousand or more." J.A. 798–99.

Because he could have been qualified as an expert, any error flowing from his testimony was harmless.

## V.

## A.

Finally, we consider Darosa's challenge to the sufficiency of the evidence at trial. In reviewing such a challenge, we "construe the evidence in the light most favorable to the government, assuming its credibility, and drawing all favorable inferences from it." *United States v Penniegraft*, 641 F.3d 566, 571–72 (4th Cir. 2011) (cleaned up). We must sustain the jury's verdict if any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

## B.

The government presented ample evidence on which a rational trier of fact could have found Darosa guilty. The evidence showed that the robber was writing in a notebook before entering Atlantic Metals Xchange. Darosa's fingerprint was on the page of the notebook containing the address that the robber gave Schipani. Darosa's DNA was also on a roll of duct tape found at the scene.

Police officers found several of Schipani's stolen items in Darosa's vehicle and apartment. In the days leading up to the robbery, Darosa's phone traveled three times to the area near the store, and once to the area near Dillulio's home. During the time of the

15

robbery, the phone was near Darosa's apartment, and several calls went unanswered.  No outgoing calls were made until shortly after the robbery.  In recorded jail calls, Darosa made various statements that could be reasonably construed as discussing the stolen property.  And Darosa's girlfriend sold some of the stolen items in the days following the robbery.

Darosa complains that the evidence was circumstantial.  True, some of this evidence alone may not be enough to find Darosa guilty beyond a reasonable doubt.  But viewed in the light most favorable to the government, the evidence as a whole is more than enough for a reasonable trier of fact to find Darosa guilty.

\* \* \*

For these reasons, we affirm the district court's judgment.

*AFFIRMED*