**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-4220**

_____

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

RONALD DAMONE JENKINS, JR., a/k/a G, a/k/a GG, a/k/a Gee, a/k/a Gee Gee,

        Defendant – Appellant.

_____

**No: 24-4221**

_____

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

JAPREE LORTEZ BROOKS, a/k/a Choppa, a/k/a Khoppa, a/k/a Primo,

        Defendant – Appellant.

**No: 24-4236**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

MALIK TREVONTE NEWSOME, a/k/a Red, a/k/a Redd, a/k/a Hitman Redd,

        Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia at Norfolk. Jamar Kentrell Walker, District Judge. (2:22-cr-00101-JKW-DEM-1)

Argued:      September 12, 2025           Decided:  March 10, 2026
                   Amended: March 12, 2026

Before AGEE, RICHARDSON and BERNER, Circuit Judges.

Affirmed in part and reversed, vacated, and remanded in part by published opinion. Judge Agee wrote the opinion in which Judge Richardson and Judge Berner join.

**ARGUED:** Paul Graham Beers, GLENN, FELDMAN, DARBY & GOODLATTE, Roanoke, Virginia; Sicilia Englert, LAW OFFICE OF SICILIA C. ENGLERT, LLC, Alexandria, Virginia, for Appellants. Kristen Shannon Taylor, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Mark Diamond, Pound Ridge, New York, for Appellant Malik Trevonte Newsome. Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

2

AGEE, Circuit Judge:

Ronald Damione Jenkins, Japree Lortez Brooks, and Malik Trevonte Newsome appeal different components of their convictions and sentences arising from a conspiracy to commit and the commission of various violent crimes in retaliation for a rival gang killing Brandon Leonard. For the reasons set forth below, we largely reject the arguments on appeal and affirm the Defendants' convictions and sentences with one exception. Because the Government did not come forward with sufficient evidence to support Brooks' conviction for violent crime in aid of racketeering activity (VICAR) based on attempted murder and a related firearms conviction, we reverse the district court's denial of judgment of acquittal as to those convictions, vacate Brooks' sentence, and remand for resentencing.

I.

A.

This appeal arises from the activities of a group labeled at trial as "Brandon's crew," so denominated in reference to the group's leader, Brandon Leonard. The underlying events, tailored to discuss evidence relevant to the issues on appeal, are recounted from the trial record in the light most favorable to the Government. *United States v. Darosa*, 102 F.4th 228, 237 (4th Cir. 2024) ("In reviewing [a conviction after a jury trial], we construe the evidence in the light most favorable to the government, assuming its credibility, and drawing all favorable inferences from it." (cleaned up)).

In the early 2000s, Brandon was a leader of a street gang in Franklin, Virginia, known as the "Low Lives." This gang consisted of Brandon's brother, Edward Leonard

3

("EJ"); Derrick Griffin; and others who committed various criminal acts together. While serving time for state drug offenses, Brandon joined the Brim Bloods, a subset of the nationwide Bloods gang.

Upon his release from prison, Brandon lived with EJ and another individual in a house on Railroad Avenue known as the "Railroad." Around this time, Brandon gave EJ money to resume selling drugs in Franklin and EJ soon made enough money from selling drugs that it became his primary revenue source. Jenkins also sometimes lived at the Railroad and he too sold drugs regularly enough that it was his primary source of income. Brooks introduced EJ, Jenkins, and other individuals to a drug supplier in North Carolina, a member of the same Bloods set to which Brooks belonged. The Railroad became a "headquarters" of sorts, attracting members of the Low Lives (including Brandon and EJ), individuals belonging to different sets of Bloods (including Brooks and Newsome), as well as individuals who did not formally identify with any gang. J.A. 506.[1] From this location, individuals could relax, play dice and engage in other social activities, distribute drugs (including crack, heroin, and powder cocaine), and store or borrow an array of firearms that were "always around" for use. J.A. 517.[2]

---

[1] Brandon's crew was not itself a Bloods set, though it may be described as having a Bloods-leaning loyalty since many of its members were also members of several Bloods sets.

[2] EJ testified that he held firearms for and sold firearms to members of the crew. He also stored ammunition and other firearm accessories at the Railroad for use by others, using money earned from his drug transactions to purchase them.

During this time, Brandon developed a reputation as "the respected head Blood member," J.A. 1174, who "you don't cross," J.A. 498. Around the same time, a competing gang associated with the Crips, known as the 00s ("double 0s"), also operated in Franklin. Among the 00s' members were Shuntrel McNear, Loron Barnes, and Larry Parrish. While the Bloods and the Crips are nationwide rival gangs, for a period of time Brandon's crew (and its individual Bloods members) and the 00s coexisted without open hostility given their common upbringings and Brandon's exercise of authority. For example, Brandon charged members of the 00s "tithes" so that they too could distribute drugs in Franklin. J.A. 516–17.

That symbiotic existence ended in December 2017. The evening of December 16th, Barnes confronted Brooks for allegedly selling him a "broken gun." J.A. 1183. Brandon intervened and pulled a firearm on Barnes, leading Brooks and McNear to also pull their guns. The incident ended with Barnes telling Brandon that if he didn't use the firearm "now, then I'll be back." J.A. 519.

The next day, Brandon went missing. Friends and family spread word to look for him, and members of Brandon's crew gathered at the Railroad that afternoon and evening to discuss and coordinate a search. According to witnesses in attendance, "[t]he atmosphere [was] tense, a lot of anger, people upset, a lot of adrenaline running," "a lot of rage going on at this moment" as people discussed "revenge" and "[r]etaliation" and "shoot[ing] somebody up." J.A. 520 (first two quotes), 522 (last three quotes). By evening, Brandon's body had been discovered in a ditch near the Railroad.

5

Within a short time of learning of Brandon's death, EJ, Brooks, and others from the Railroad ended up reconvening at Newsome's brother's house on South Street to mourn and plot revenge against Barnes and McNear, the two 00s members that they believed were responsible for Brandon's death. Around 3:00 a.m., they left in search of Barnes and McNear. EJ and Brooks were in separate vehicles, and "[n]ot long" after departing, EJ heard "three or four" shots being fired from the other vehicle as they drove by the home of McNear's mother. J.A. 1193.[3] Shortly thereafter, EJ confirmed with Brooks that he'd fired the shots. A later police investigation revealed that three bullets had entered the residence above the front door, above a bedroom window, and into the attic.

Barnes and McNear were not located on the evening of December 18, but they were seen the next evening. After learning that Barnes and other 00s were on Madison Street, EJ, Newsome, and others "plotted and planned to do a shooting over there." J.A. 407. Newsome and others took one of EJ's firearms to execute their plan, leading to Barnes and another 00s member being shot. Their wounds were not fatal.

After the Madison Street shooting, things calmed for many months and some members of Brandon's crew left town or were incarcerated. But in February 2019, on what would have been Brandon's birthday, 00s began posting and circulating an image of a blue hat (Crips imagery) and a scoreboard of "0 to 1" on social media with the text "[a]in't nobody from Double 0 get his but Lil B [i.e., Brandon] did." J.A. 1214–15. In addition, McNear posted a video recorded "happy birthday" message that EJ interpreted as

---

[3] McNear's mother lived a few houses down from Newsome's brother.

6

"taunt[ing], like he killed my brother." J.A. 1217. "[F]urious," EJ "sent [the social media posts] all over," ultimately reconvening with Jenkins to exact revenge. J.A. 1217–18. They determined McNear's location and "shot him up" by firing multiple rounds at him and another individual as they were in a vehicle. J.A. 1221. McNear survived, with extensive injuries.

B.

After their arrests, Jenkins, Brooks, and Newsome were detained pending trial. In July 2023, Newsome used another inmates' identification number to call his friend Quenacia Bynum. During the call—which was recorded—Newsome asked Bynum to say that the two had been together in North Carolina from December 18 to 19, 2017. Bynum responded that she would not do that and hung up the phone. She then ignored several more phone calls and ripped up a letter Newsome later sent her.

That was not Newsome's only attempt to secure an alibi; in August 2023, he contacted his child's mother, Akeiba Goodwyn, to ask her to say that they were together in December 2017. Goodwyn testified she could not recall if they were together.

C.

Defendants exercised their right to a jury trial, and a jury convicted them of the following offenses that are challenged on appeal:

- Count I (all defendants): conspiracy to commit VICAR murder, namely, the December 17–19, 2017 conspiracy to murder 00s after Brandon's death, in violation of 18 U.S.C. § 1959(a)(5);
- Count II (Brooks): VICAR attempted murder arising from the December 18, 2017 shooting at the South Street residence of McNear's mother, in violation of 18 U.S.C. §§ 1959(a)(5) and (2);

7

- Count III (Brooks): discharge and use of a firearm in relation to a crime of violence, namely, the VICAR attempted murder described in Count II, in violation of 18 U.S.C. §§ 1959(a)(5) and (2);

- Count IV (Jenkins): VICAR attempted murder arising from the February 8, 2019 shooting of 00s gang member McNear, in violation of 18 U.S.C. §§ 1959(a)(5) and (2); and

- Count IX (Newsome): witness tampering for attempting to influence one or more persons to give false testimony at trial, in violation of 18 U.S.C. § 1512(b)(1).[4]

Defendants' motions for a Rule 29 judgment of acquittal were denied. In separate sentencing hearings, the district court sentenced Jenkins to 300 months' imprisonment, Brooks to 420 months' imprisonment, and Newsome to 273 months' imprisonment.

Defendants noted timely appeals, and the Court consolidated them for briefing and oral argument. The Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.

"[W]e review de novo a district court's denial of a motion for judgment of acquittal." *United States v. Fuertes*, 805 F.3d 485, 501–02 (4th Cir. 2015).

Most of the arguments on appeal challenge the sufficiency of the evidence to convict. Such arguments "must overcome a heavy burden" to prevail, *United States v. Robinson*, 855 F.3d 265, 268 (4th Cir. 2017), and we will reverse only when "the prosecution's failure is clear," *Fuertes*, 805 F.3d at 502 (cleaned up). When reviewing the

---

[4] Three convictions are not at issue on appeal. Jenkins' one count of being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count VI); and Brooks' two counts of witness tampering, in violation of 18 U.S.C. § 1512(b)(1) (Counts VII and VIII). In addition, the jury found Jenkins not guilty of one firearms offense (Count V).

sufficiency of the evidence, the Court "does not decide for itself whether the evidence establishes guilt beyond a reasonable doubt." *Bufkin v. Collins*, 604 U.S. 369, 386 (2025). "Instead, it construes all evidence and makes all reasonable inferences in favor of the prosecution, and asks whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). And the Court may not "overturn a substantially supported verdict" simply because it deems "the verdict unpalatable" or concludes that "another, reasonable verdict would be preferable." *Robinson*, 855 F.3d at 268 (internal quotation marks omitted).

## A. VICAR-related Convictions

The federal "VICAR statute complements the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 through 1968, by addressing the particular danger posed by those who are willing to commit violent crimes in order to bolster their positions within [racketeering] enterprises." *United States v. Keene*, 955 F.3d 391, 394 (4th Cir. 2020) (cleaned up).[5] To establish that Defendants violated the VICAR statute, the Government had to prove:

(1) the existence of a RICO enterprise;

(2) that the enterprise was engaged in racketeering activity;

(3) that the defendant had a position in the enterprise;

---

[5] "The legislative history of the [VICAR] statute indicates that 'enterprise' in this section and in RICO are intended to 'have the same scope[,]'" so cases regularly rely on discussions of one when analyzing the other. *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994).

9

(4) that the defendant committed one of the crimes specified in the VICAR statute[, which includes both conspiracy to murder and attempted murder, § 1959(a)(5); and]

(5) that the defendant's purpose was to maintain or increase his position in the enterprise.

*Id.* (cleaned up and formatting added).

Thus, one common element for the conspiracy and other VICAR offenses is the existence of an "enterprise," which exists when a group of individuals "associate[] together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). An enterprise is "proved by evidence of [(1)] an ongoing organization, formal or informal, and [(2)] by evidence that the various associates function[ed] as a continuing unit." *Id.*

Further, 18 U.S.C. § 1959(b)(2) defines an "enterprise" to "include[] any . . . group of individuals associated in fact although not a legal entity." In interpreting what this language means, the Supreme Court has held that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). That said, the Supreme Court has reiterated that this language is "obviously broad" and "expansive," with the term "any" to describe the relevant "group" "ensur[ing] that the definition has a wide reach." *Id.* at 944; *accord United States v. Palacios*, 677 F.3d 234, 249 (4th Cir. 2012) (stating that the Supreme Court has "cautioned . . . against reading the term 'enterprise' too narrowly").

10

1.  Conspiracy to Commit Murder in Aid of Racketeering (Count I)

Defendants were each convicted of Count I, which charged a conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5), based on the events of December 17–19, 2017—their endeavor to murder individuals they suspected of killing Brandon. Defendants all challenge the sufficiency of the evidence to support the existence of an "enterprise." In addition, Brooks and Newsome raise additional arguments challenging other elements of the offense. We address each argument in turn.

a.  Existence of an Enterprise

Defendants challenge the sufficiency of the evidence to show that the group the Government termed "Brandon's crew" constituted an association-in-fact enterprise for purposes of the VICAR statute. In other words, they argue there's insufficient evidence of structure, unity, and common purpose. They point out that the record does not show the hallmarks of a traditional gang, such as a hierarchy between individuals, that dues were paid, or that there were initiation rites or rules for this group of individuals. In addition, they assert that the Railroad was simply a social hub for hanging out and playing dice, not for coordinating criminal activity. And they argue that, although the record shows that several members of the group may have sold drugs, it does not show synchronized or coordinated criminal activity, but separate entrepreneurship. Based on the foregoing, they argue the record fails to show the requisite characteristics of an enterprise.

Under our deferential review of jury verdicts, we conclude that there was sufficient evidence from which a rational jury could conclude that "Brandon's crew" has the requisite

11

"structure" for purposes of VICAR.[6] In *Boyle*, the Supreme Court discussed what this term meant: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946. And at the outset, in undertaking our review of the record for this evidence, we are mindful that we must view the evidence in the light most favorable to the Government, drawing all reasonable inferences in its favor. *United States v. Savage*, 885 F.3d 212, 219–20 (4th Cir. 2018).

At trial, the jury heard testimony that showed the purpose of Brandon's crew was to control who trafficked drugs in Franklin, Virginia. This included evidence of drug dealing by members of Brandon's crew. For instance, Brandon fronted money to EJ to purchase drugs that would later be sold. Other members benefited from Brandon's ties to the Bloods. And Brooks introduced the crew to a Blood member (Weezy) who became a primary drug supplier for many members of the crew. Trial testimony also established that Brandon's

---

[6] Our deferential standard of review supports upholding the verdict. We first note that the facts of this case could reflect that the individuals might have been charged and convicted for a general, state-law conspiracy to commit murder rather than a federal VICAR conspiracy. In addition, we note that our opinion should not be read to suggest that mere associations of friends, even those involved in individual illicit activities, would, in and of itself, satisfy the requirements of an "enterprise" for purposes of VICAR and RICO. *See e.g.*, *Boyle*, 556 U.S. at 947 n.4 ("It is easy to envision situations in which proof that individuals engaged in a pattern of racketeering activity would not establish the existence of an enterprise. For example, suppose that several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates . . . . Proof of these patterns would not be enough to show that the individuals were members of an enterprise."); *United States v. Pinson*, 860 F.3d 152, 162 (4th Cir. 2017) (distinguishing separate ventures from the common purpose required of a RICO conspiracy).

crew shared firearms stored at the Railroad, which they could use during their drug transactions.

Beyond the purpose of solidifying their own drug trafficking, Brandon's crew also operated to control the ability of non-crew members to engage in any independent competitive criminal activity in Franklin. Jurors heard about Brandon's reputation and how others knew that they should not cross him or they would suffer the consequences. Members of Brandon's crew were permitted to sell drugs freely throughout Franklin. By contrast, until 2017, the 00s operated in Franklin only with Brandon's permission and by paying him tithes, enabling them to enter an otherwise-closed drug market. Until Brandon's death in December 2017, the 00s were viewed as an entity operating in opposition to crew members. The circumstances leading up to Brandon's death, the crew's coordinated revenge toward the 00s immediately after his death, the 00s taunting social media posts, and the February 2019 attempted murder of the 00s member thought to be responsible for Brandon's death serve as additional circumstantial evidence supporting the jury's determination that the crew possessed a common purpose.

Moving on to the next element, the record also contains sufficient evidence from which the jury could find the requisite relationships between group members. Brandon's crew consisted of his brother and other compatriots with familial and other connections who resided in and around Franklin and frequented the Railroad. Many of the same individuals from Franklin who were purchasing drugs from Weezy for resale often did so from the common location of the Railroad, and those same individuals then rallied in defense of Brandon's death to inflict the violent crimes that occurred in December 2017

13

and, later, February 2019. *See United States v. Tillett*, 763 F.2d 628, 631–32 (4th Cir. 1985); *see also United States v. Harris*, 695 F.3d 1125, 1136 (10th Cir. 2012) (concluding sufficient evidence of "relationships" existed when, inter alia, "the record demonstrate[d] that the members of the different sets saw and interacted with one another" and socialized together at the group's "club").

Finally, the record contains sufficient evidence of longevity to sustain the jury verdict. From the time Brandon was released from prison in 2012 through at least the February 2019 shootings, Brandon's crew operated in Franklin. Almost immediately upon returning to Franklin, Brandon leveraged his existing reputation to gain control of Franklin's drug operations and build a network of associates who used the Railroad as a gathering place for drug deals, firearms storage and utilization, and social activities. The record further showed that Brandon's crew banded together with others in the wake of his execution to exact vengeance in a multi-day shooting spree around town. A year later, after the 00s posted a provocative scoreboard and birthday message for Brandon on social media, two members of the crew joined forces to once again seek to avenge Brandon's death. All told, the jury could reasonably conclude from this evidence that Brandon's crew operated for a sufficient period to carry out the purpose of the charged enterprise—namely to maintain control over and profit from drug sales within Franklin. Other cases have found the longevity component of an association-in-fact enterprise satisfied by shorter and comparable periods of time. *E.g.*, *Amazon.com, Inc. v. WDC Hldgs. LLC*, 155 F.4th 313, 326 (4th Cir. 2025) (concluding longevity component was satisfied by evidence showing the scheme was devised in 2017 "and continued into early 2020"); *United States v. Garcia*,

14

74 F.4th 1073, 1112 (10th Cir. 2023) (reviewing cases indicating that "longevity" is satisfied by evidence that the enterprise operated "over a period of years" (cleaned up)); *United States v. Fattah*, 914 F.3d 112, 163–64 (3d Cir. 2019) (holding longevity requirement satisfied based on conduct spanning about seven years).

As for the components of some enterprises that this record does not contain—and which Defendants point to as a basis for arguing the evidence is deficient—*Boyle* itself made clear that "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." 556 U.S. at 948. It does not require formality or "much" structure. *Id.* (cleaned up). To that end,

> [s]uch a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules or regulations, disciplinary procedures, or induction or initiation ceremonies. . . . Nor is [an enterprise] limited to groups whose crimes are sophisticated, diverse, complex or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.*

Given our deferential standard of review, we conclude that the evidence is legally sufficient for the jury to have found that there was "the requisite commonality of purpose between [individuals in the group] to give form to the associational enterprise charged." *United States v. Griffin*, 660 F.2d 996, 1000 (4th Cir. 1981). Put another way, the evidence showed that Defendants "conducted or participated in the conduct of the *enterprise's*

15

affairs, not just their *own* affairs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (cleaned up).

We therefore reject Defendants' argument that their conviction for VICAR conspiracy must be vacated for lack of evidence supporting the enterprise element.

### b. Other Arguments

Brooks and Newsome raise additional arguments challenging other elements of their VICAR conspiracy convictions. None are convincing.

First, Brooks argues that even if there was sufficient evidence demonstrating the existence of an enterprise, there's insufficient evidence to: show he was a member of that enterprise; demonstrate that he held a position within it; or support that he engaged in any act to join, maintain, or increase a position within it. Rather, he maintains that the evidence supports that he was sometimes present at the Railroad, nothing more, and that mere presence does not make someone a member of an enterprise. Last, he argues that seeking revenge after a friend's death demonstrates motive, not that any of those acts were taken for the purpose of joining, maintaining, or increasing any position within an enterprise.

We have reviewed the record and conclude that Brooks has not met his high burden of showing that no rational factfinder could have found these elements of the charged conspiracy. Brooks was a regular at the Railroad before the events surrounding Brandon's death, connected Brandon to the group's out-of-state drug supplier, and was part of the altercation that eventually led to Brandon's death. He was also present at the Railroad and other locations where members of the enterprise decided to take revenge for Brandon's death. Further, witness testimony connected Brooks to specific firearms and shootings that

16

occurred over the relevant days. From this, we readily conclude a reasonable jury could infer Brooks' membership and position within the enterprise, and that he committed these acts as part of his position within it. *See, e.g.*, *United States v. Zelaya*, 908 F.3d 920, 927 (4th Cir. 20180) (observing that the purpose element is not a heavy burden and requires only evidence from which a "jury could properly infer that the defendant committed his violent crime . . . in furtherance of [his] membership," and that this purpose need not be his "only or primary concern" in carrying out the charged acts).

For similar reasons, we reject Newsome's additional challenges to his conspiracy conviction. He too contends that the record does not show that he knowingly entered into the charged conspiracy to maintain or increase a position within an enterprise. As support, he suggests that evidence placing him at the Railroad on the night of Brandon's death lacks credibility. But credibility determinations are squarely within the province of the factfinder, and the jury was entitled to credit that testimony. *E.g.*, *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994) ("The jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe."). What's more, his arguments ignore evidence placing him at the Railroad when the conspiracy underlying Count I formed and, later that evening, possessing a firearm whose bullets were connected to one of the shootings. Accordingly, a rational factfinder could find the challenged elements of the conspiracy offense, and we will not disturb that verdict.

17

2. Jenkins' Conviction for VICAR Attempted Murder (Count IV)

Next, Jenkins challenges his conviction for VICAR attempted murder, Count IV, which is based on the February 8, 2019 attempted murder of rival gang member Shuntrel McNear. He contends that there is insufficient evidence to support this conviction because, for the reasons already argued, there was not an "enterprise," and even if there ever was one, it no longer existed by February 2019 when the acts underlying Count IV occurred. He asserts that by then, Brandon had been deceased for some fourteen months and most of the enterprise's purported members had left town or were in prison and, in any event, were out of contact. He thus argues that the attempted killing of McNear in February 2019—which involved just two of the original members of the enterprise—was an act not attributable to or part of any enterprise.

To the extent Jenkins' argument rests on there never having been an "enterprise," that argument fails for the same reasons we rejected it earlier. *See supra* II.A.1.a.

Jenkins' remaining arguments fare no better. At the outset, he is incorrect in suggesting that a fourteen-month gap in time between an enterprise's criminal acts must mean that they were not part of the same criminal enterprise's endeavors. In *Boyle*, the Supreme Court recognized that "[w]hile the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." 556 U.S. at 948. *Boyle*'s facts illustrate how this ebb and flow can operate. There, the record showed that a core group of individuals participated in multiple thefts over several years and then the defendant joined that group "over the [following] five

years" to participate in "numerous attempted night-deposit-box thefts and at least two attempted bank-vault burglaries." *Id.* at 942. Over the defendant's objections, the Court affirmed that the periods of "quiescence" between criminal "spurts" over the course of years did not preclude the requisite jury findings connecting the latter conduct to the same criminal enterprise that had first acted years prior. *Id.* at 948. Thus, insofar as Jenkins is arguing that, as a matter of law, the February 2019 incident could not be part of the enterprise that last acted some fourteen months earlier, that argument fails under *Boyle*. Simply put, a period of "quiescence" does not mean that an enterprise must have ceased and a new criminal endeavor commenced.

The above understanding of what the law permits means that the only remaining question before us is a quintessential matter for the jury to determine as the fact finder: under the record evidence, were the requisite characteristics of an association-in-fact still present as of February 2019 such that those acts could be deemed part of the same enterprise's conduct? Here, we conclude that "a rational trier of fact could" answer that question affirmatively. *Darosa*, 102 F.4th at 237 ("We must sustain the jury's verdict if any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." (cleaned up)).

As discussed above, the Government's evidence contained enough for a jury to find a commonality of purpose (to maintain dominance in Franklin against the 00s and avenge Brandon's death), relationship (EJ and Jenkins), *and* duration (forming and reconstituting for members of the group to pursue that same purpose) to find that the "enterprise" labeled as Brandon's crew continued through February 2019. The challenged enterprise element

19

of the VICAR attempted murder conviction thus satisfied, we therefore affirm Jenkins' conviction as to Count IV.

### B. Brooks' VICAR Attempted Murder & Related Firearm Convictions
### (Counts II and III)

Count II charged Brooks with VICAR attempted murder, in violation of 18 U.S.C. §§ 1959(a)(5) and (2), and Count III charged him with unlawful discharge of a firearm in furtherance of a crime of violence (the VICAR attempted murder in Count II), in violation of 18 U.S.C. §§ 924(c)(1)(A) and (2). The underlying factual basis for these counts was a December 2017 "attempt to murder individual occupants of the residence located in the 2200 block of South Street in Franklin, Virginia, in violation of Va. Code §§ 18.2-32, 18.2-26, and 18.2-18." J.A. 86.

To convict Brooks, the Government had to prove, in addition to the enterprise-related elements, that he attempted to "commit murder" consistent with Virginia's offense of attempted murder. *See* 18 U.S.C. § 1959(a)(5); *see also United States v. Simmons*, 11 F.4th 239, 271 (observing that we look to state law to determine whether the cross-referenced state-law predicate offense that is alleged in the indictment occurred). To prove attempted murder under Virginia law, the Government had to prove that Brooks acted with "(1) a specific intent to kill the victim and (2) some overt act in furtherance of that intent." *United States v. Lassiter*, 96 F.4th 629, 636 (4th Cir. 2024) (quoting Virginia cases); *see, e.g.*, *Commonwealth v. Herring*, 758 S.E.2d 225, 235 (Va. 2014). Virginia defines "specific intent" as "the intent to accomplish the precise criminal act that one is later charged with."

*Winston v. Commonwealth*, 604 S.E.2d 21, 41 (Va. 2004) (quoting Black's Law Dictionary 826 (8th ed. 2004)).

On appeal, Brooks challenges these convictions principally by arguing that the record does not establish his specific intent to kill anyone when he fired three rounds into the South Street residence. He contends there's no evidence that Brooks believed McNear—or anyone else, for that matter—was home in the early morning hours when the shots were fired from the street toward the residence. He notes that the shots were fired *ad hominem* at an upward trajectory toward the single-level home, entering over the front door, above a bedroom window, and into the attic. From this, Brooks asserts that the record does not permit a reasonable fact finder to find that he possessed the specific intent to kill anyone, much less a specific person, by firing those shots at the house.

Having reviewed Virginia's case law regarding the specific intent required to commit the offense of attempted murder, and mindful of the heavy burden Brooks faces in raising a sufficiency challenge, we agree with him that the evidence of record does not support a finding that he had the specific intent to murder when he discharged his firearm toward the South Street residence. At the outset, it is clear that "use of a deadly weapon, standing alone, is not sufficient to prove the specific intent required to establish attempted murder." *Hargrave*, 201 S.E.2d 597, 598 (Va. 1974) (per curiam); *see also Thacker v. Commonwealth*, 114 S.E. 504, 505 (Va. 1922) ("The law does not presume, because an assault was made with a weapon likely to produce death, that it was an assault with the intent to murder."). More is required to convict, and that "more" requires establishing the defendant's specific intent to murder when employing the deadly force. After all, "[w]hen

21

a statute makes an offense to consist of an act combined with a particular intent, that intent is just as necessary to be proved as the act itself, and must be found as a matter of fact before a conviction can be had[.]" *Thacker*, 114 S.E. at 505. To satisfy its burden of proving specific intent, the government can rely on "inferences to be drawn from proven facts, so long as they are reasonable," showing specific intent "by circumstances, including by a person's conduct or by his statements." *Hancock v. Commonwealth*, 407 S.E.2d 301, 306 (Va. App. 1991). And, in all events, "[i]t is permissible for the fact finder to have concluded that a person intended the immediate, direct, and necessary consequences of his voluntary acts." *Id.*

Over a century ago, Virginia's highest court looked to a respected treatise to elaborate what proof is necessary to show the specific intent to murder by way of an example that fits the facts of this case. In *Thacker v. Commonwealth*, the court opined:

> To set fire to a house and burn a human being who is in it, but not to the offender's knowledge, would be murder, though the intent was to burn the house only; but to attempt to set fire to the house under such circumstances would be an attempt to commit arson only and not an attempt to murder. A man actuated by general malevolence may commit murder, though there is no actual intention to kill; to be guilty of an attempt to murder there must be a specific intent to kill.

114 S.E. at 506 (quoting Clark's *Criminal Law*, p. 111). Subsequent Virginia cases have reaffirmed this point—sustaining attempted murder convictions challenged on the basis of evidence supporting specific intent only when the facts directly or circumstantially permit the conclusion that, at the moment the defendant employed deadly force, he intended to kill someone. *See, e.g., Coles v. Commonwealth*, 621 S.E.2d 109, 112 (Va. 2005) (affirming conviction for attempted murder when the defendant driver "swerved to the left

22

and *aimed [his vehicle] directly toward* [a police] officer and the police vehicle," "ram[ming] the heavy police cruiser and push[ing] it toward [the officer], causing him to 'jump back' to avoid injury"); *Hancock*, 407 S.E.2d at 306 (affirming attempted murder conviction based on evidence that the defendants (1) knew a building was occupied, (2) "poured gasoline on a cushion, placed it in front of the only door which provided a means of egress, and set it on fire," and (3) then threatened the occupants "that they would be shot if they attempted to leave"); *accord Bell v. Commonwealth*, 399 S.E.2d 450, 452–53 (Va. App. 1991) (same).

Applying these principles from *Thacker* and its progeny to the record in this case compels the reversal of Brooks' VICAR attempted murder conviction. The evidence does not permit a rational jury to find that when he discharged his firearm, he possessed the specific intent to murder anyone at the residence. As these cases demonstrate, when examining whether Brooks possessed the requisite specific intent, "the question . . . is not whether [his] acts might have resulted in the murder of [an inhabitant of the residence]. Rather, the question is whether [Brooks], [when shooting at the residence], formed the specific intent . . . for the unequivocal purpose of murdering [someone]." *Haywood v. Commonwealth*, 458 S.E.2d 606, 608 (Va. App. 1995). Here, there's no evidence that, at the time he discharged his weapon, Brooks intended to kill McNear's mother, any other occupant of the house, or someone within the trajectory of his shots. Evidence of Brooks' familiarity with the neighborhood meant that he knew that McNear's mother resided at this location, but it does not permit an inference that Brooks intended at that time to kill her or any other occupant. At most, evidence that he knew whose residence it was shows why he

23

decided to shoot at *this* residence, not that he attempted to murder an occupant.[7] And although the Government points to the early-morning hour and the fact that Brooks shot at a residence as a basis for inferring it *might* be occupied at the time, that is a far cry from sufficient evidence to permit an inference that Brooks fired his weapon with the specific intent to murder an occupant of that residence. The record does not show that Brooks knew or had any reason to know that *anyone* was inside the residence (or, for that matter, anywhere within the trajectory of his shots). *Cf. Secret v. Commonwealth*, 819 S.E.2d 234, 249 (Va. 2018). (affirming attempted murder conviction based on record evidence "establish[ing] that [the defendant] had full knowledge that [the residence] was undoubtedly occupied by several individuals at the time he set the fire"). Last, while the Government came forward with evidence from which a jury could infer that Brooks had the specific intent to kill McNear on the evening of the shooting, nothing placed McNear at that property on the evening of the shooting (or, for that matter, with any regularity in the timeframe at issue). This disconnect is fatal to the Government's case as to Count IV.

In sum, there's no evidence supporting a finding that "*the immediate, direct, and necessary consequences*" of Brooks' firing at the residence would have been the murder of one or more individuals absent intervening events. *Hancock*, 407 S.E.2d at 306. As *Thacker* reflects, had Brooks actually killed someone when he discharged his firearm toward the

---

[7] While not directly bearing on Brooks' sufficiency argument, we note that Virginia has a separate offense of shooting at an occupied dwelling, Va. Code § 18.2-279, which does not contain an intent element. *See Bryant v. Commonwealth*, 811 S.E.2d 250 (Va. 2018); *Ellis v. Commonwealth*, 706 S.E.2d 849 (Va. 2011). To permit the facts here to satisfy a charge of attempted murder would essentially turn every firearm discharge at an occupied dwelling into an attempted murder offense.

South Street residence, regardless of his intent, the evidence would have supported a finding of general intent sufficient to support a murder conviction (assuming the other elements were satisfied). 114 S.E. at 506. From these same principles, had he only injured someone as a result of discharging his weapon, that would not be sufficient to show attempted murder without the specific intent to kill by so doing. *Accord Secret*, 819 S.E.2d at 241. (Under these facts, such an individual might be guilty of malicious or unlawful wounding under Virginia law, but those are separate offenses, and are also distinguished based on evidence regarding the shooter's intent. *See* Va. Code § 18.2-51.) These hypotheticals point precisely to the distinction that matters here; as a specific intent offense, attempted murder requires proof that the defendant acted with the intent to kill when he fired the shots.

Permitting the evidence in this case to satisfy Virginia's specific intent requirement for attempted murder would run afoul of well-established case law, which we are not at liberty to do. Thus, despite the high hurdle a defendant faces to disturb a jury verdict, we must vacate Brooks' VICAR attempted murder conviction (Count II) for failure of proof of specific intent to murder an occupant of the South Street residence. Given that disposition, we also reverse the related unlawful discharge conviction (Count III), which was predicated only on being "in furtherance of" that VICAR attempted murder offense.

25

*See* § 924(c)(1)(A). As Brooks' convictions for Counts II and III are vacated, we also vacate his sentence and remand for resentencing.[8]

### C. Newsome's Conviction for Witness Tampering (Count IX)

Newsome challenges the sufficiency of the evidence to support his conviction for witness tampering, in violation of 18 U.S.C. § 1512(b)(1), which makes it a crime to "knowingly use[] intimidation, threaten[], or corruptly persuade[] another person, or attempt[] to do so, or engage[] in misleading conduct toward another person" with the intent to influence the testimony of any person in an official proceeding. Count IX of the operative indictment charged Newsome with committing this offense "[o]n or about July 21, 2023." J.A. 93.

At trial, Quenacia Bynum testified that in July 2023, Newsome—with whom she had a personal relationship—called her from prison and asked her to say that she had been with him at his grandma's house in North Carolina from December 18 to 19, 2017 (the days after Brandon's death). She testified that saying so would have been false, and that she promptly ended the call after realizing what he wanted her to do. Thereafter, she

---

[8] There are two ways the now-vacated counts impacted Brooks' overall sentencing proceeding. First, to calculate Brooks' Guidelines range, the PSR grouped his convictions for Counts I, II, VII, and VIII to calculate one offense level and separately calculated the offense level for Count III. It then relied on the higher level, which ended up being for Count III. From there, it determined Brooks' Guidelines range. At sentencing, the district court adopted the PSR Guidelines calculation over Brooks' objections. This resulted in an adjusted Guidelines range of 360 to 720 months' imprisonment. Second, the district imposed a total sentence of 420 months' imprisonment, imposing consecutive sentences of various lengths for Counts I, II, III, and VII, and a concurrent sentence for Count VIII. Given the plain impact that Counts II and III had both in calculating Brooks' Guidelines range and in then formulating the sentence imposed, vacating and remanding for resentencing is the proper remedy.

ignored dozens more of his calls and ripped up a letter that he sent from prison. The Government also introduced an audio recording of their conversation and proof that Newsome had used another inmate's identification to place the call.

The Government also elicited testimony from Akeiba Goodwyn, who has a child with Newsome, that in August 2023 Newsome had called her from prison to ask her to say that they were together during the relevant December 2017 dates, but that she could not recall if they were actually together at that time because "he pops in and pops out . . . from certain time frames." J.A. 889–93.

When instructing the jury on this count, the court recited Count IX of the indictment, quoted the relevant statutory language, and then set out the three elements of the offense.

On appeal, Newsome contends that the evidence showed that he never threatened any witness, but rather asked them to testify truthfully to information that would exonerate him from participating in the offenses that occurred in December 2017. He also maintains that the jury verdict is further suspect because the jury was instructed that Newsome had to participate in four distinct acts—intimidating, threatening, corruptly persuading, *and* attempting to do the same—when there's no evidence at all of a threat or intimidation. So, according to Newsome, the jury could not have followed these instructions and found that he engaged in all three acts. As a final basis for reversing his obstruction conviction, Newsome argues that at trial the Government presented evidence based on Newsome's statements to two witnesses—Bynum *and* Goodwyn—but on appeal, the Government relies on his statements to Bynum alone support his conviction. He concludes that because the jury heard evidence of witness tampering as to both witnesses and was told that he had

27

thereby tampered with "one or more persons," it's entirely possible that the guilty verdict is based on evidence relating to Goodwyn, not Bynum. For all these reasons, he asks us to reverse his conviction.

None of Newsome's arguments cast doubt on his conviction for witness tampering. The jury was entitled to credit Bynum's testimony, recounted above, that Newsome asked her to lie about being together on the relevant dates, and that testimony is sufficient to find each necessary element of witness tampering. *United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983) ("[I]n assessing the sufficiency of the evidence to support the jury's determination, we can only inquire whether there is substantial evidence, taking the view most favorable to the [G]overnment, from which the jury might find the defendant guilty beyond a reasonable doubt. We, of course, do not weigh the evidence or review the credibility of witnesses[.]" (internal citations omitted)).

Nor does Newsome's attack on the jury instructions persuade. Among other things, this argument is based solely on the instruction that simply recounts the indictment and ignores the remaining instructions. *See* J.A. 1603. It's the totality of the instructions that matter. *United States v. Sanders*, 107 F.4th 234, 259 (4th Cir. 2024) ("[W]e do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." (cleaned up)). Collectively, the instructions accurately quote the indictment, which itself "*must* allege conjunctively the disjunctive components of [the] underlying statute." *E.g.*, *United States v. Vann*, 660 F.3d 771, 774 (4th Cir. 2011) (en banc) (per curiam) (emphasis added). The instructions then correctly recited the elements of the offense, the means of

28

satisfying each element, and what findings were necessary to convict. Nothing about this approach or repetition suggests that the jury would be confused or that the verdict would be based on anything other than what the statute requires.

To the extent Newsome's argument relies on a lack of evidence of threats or intimidation, he ignores that this element of this offense can also be satisfied upon proof of corrupt persuasion of a witness. § 1519(b)(1). That "require[s] the Government to prove a defendant's action was done voluntarily and intentionally to bring about false or misleading testimony with the hope or expectation of some benefit to the defendant." *United States v. Edlind*, 887 F.3d 166, 174 (4th Cir. 2018) (citation omitted); *see also id.* at 173–74 (describing how the phrase "corrupt persuasion" operates to distinguish innocent acts from those committed by "persons conscious of wrongdoing, that is, persons acting with wrongful, immoral, depraved, or evil intent" (cleaned up)); *accord Arthur Andersen LLP v. United States*, 544 U.S. 696, 704–06 (2005) (same). "A defendant's directive to a witness to lie to investigators or at trial always suffices" to satisfy corrupt persuasion. *Edlind*, 887 F.3d at 174 (citation omitted). Notably, Newsome raises no argument that the evidence is insufficient as to this means of committing the offense.[9]

---

[9] Nor are we persuaded by Newsome's argument that the Government has shifted its theory from tampering with both Bynum and Goodwyn at trial and relying on Bynum alone on appeal. Count IX charged Newsome with committing this offense "on or about July 31, 2023," J.A. 93, a date that directly corresponds to the evidence relating to his prison call to Bynum. While the charge also alleged that Newsome attempted to influence "one or more" persons, J.A. 93, proof that Newsome attempted to influence Bynum alone patently satisfies that charge.

For these reasons, Newsome's sundry arguments challenging the sufficiency of the evidence to support and the accuracy of the jury instructions concerning his obstruction offense fail. We therefore affirm this conviction.

## E. Newsome's Sentence

Last, Newsome challenges the procedural and substantive reasonableness of his 273-month sentence of imprisonment: 120 months' for the RICO conspiracy (Count I) and 153 months' for the witness tampering conviction (Count IX), consecutive to Count I.[10] In his view, the district court should have granted a downward variant sentence because the § 3553(a) factors favor that reduction. As support, he points to his difficult upbringing and other personal characteristics, but he mostly points to perceived weaknesses with the evidence supporting his witness-tampering conviction. In addition, he observes that the district court had acknowledged that he was the "least culpable" of the three co-defendants, yet it ultimately imposed a sentence only twenty-seven months lower than Jenkins's 300-month sentence. He argues that this isn't a sufficient enough difference to meaningfully account for their relative culpability.[11]

---

[10] At sentencing, no party objected to Newsome's Guidelines calculation. With a total offense level of 39 and a criminal history category of V, Newsome's Guidelines range was 360 months' to life, capped at 360 months' imprisonment due to the statutory maximum sentence. Newsome successfully moved for a downward departure of 27-months under U.S.S.G. § 4K2.23, which the court considered when imposing its sentence. The Government advocated for a 360-month sentence, and Newsome asked for 180 months' total imprisonment.

[11] In passing, Newsome asserts that "[f]or the same reasons" the district court erred in imposing a two-level enhancement to his offense level under U.S.S.G. § 3C1.1 for obstructing or impeding the administration of justice. Opening Br. 50. Newsome has

(Continued)

We review the procedural and substantive reasonableness of a sentence for abuse of discretion, reviewing "the district court's factual conclusions for clear error . . . and its legal conclusions *de novo*." *United States v. Elboghdady*, 117 F.4th 224, 234 (4th Cir. 2024) (cleaned up). In undertaking this review, we must first consider the procedural reasonableness of the sentence—such as whether the court failed to appropriately consider the relevant sentencing factors—before turning to its substantive reasonableness, "considering the totality of the circumstances." *United States v. Friend*, 2 F.4th 369, 379 (4th Cir. 2021) (cleaned up).

Having reviewed the district court's thorough exchange with counsel and explanation of the sentence imposed, we reject Newsome's argument. In short, the district court considered his non-frivolous arguments for a lower sentence, explained why it was rejecting those arguments and why—in its view of the lengthy trial record—its sentence

---

arguably waived review of this issue for failure to develop a cogent argument about why the enhancement was error. *See United States v. Fernandez-Sanchez*, 46 F.4th 211, 219 (4th Cir. 2022). But even assuming he did not, our review would be for plain error given that he did not directly develop any Guidelines-based objection to imposing the enhancement at sentencing. *See United States v. Knight*, 606 F.3d 171, 177 (4th Cir. 2010); *see also* Fed. R. Crim. P. 52(b).

We discern no error, let alone plain error, in the court's decision to impose this enhancement based on the conviction for witness tampering given that the convictions were grouped for purposes of establishing Newsome's offense level and the conspiracy conviction set the base offense level. *See* U.S.S.G. § 3C1.1 app. n.8 ("If the defendant is convicted both of an obstruction offense . . . and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense . . . . The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.").

31

satisfied the § 3553(a) factors. That's sufficient to satisfy its duties to impose a procedurally reasonable sentence. *See, e.g.*, *Friend*, 2 F.4th at 379–81 (rejecting similar arguments for similar reasons).

Newsome's sentence is also substantively reasonable. Here, the sentence imposed, which was based on a downward departure from the calculated Guidelines range, is presumptively reasonable on appeal. *Id.* And Newsome's burden is high—as the "fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.* Sentencing "is a quintessentially fact-specific and multifaceted exercise," and we will not disturb the district court's discretion to determine how a particular defendant's conduct (whether more or less culpable than his co-defendant's) ultimately stacks up against the § 3553(a) assessment. *Id.* at 382–83.

In reaching both of these conclusions, we take special note of the following aspects of the district court's sentencing explanation. First, the district court engaged in a dialogue with the Government about Newsome's comparative culpability with his co-defendants and later discussed that factor at length when explaining the sentence it decided to impose. On that point, Newsome cherry picks part of the court's assessment (that he was somewhat less culpable than his co-defendants) without considering the whole of the court's observations, which took "in[to] consideration" that Newsome had not been "convicted of participating in any of the actual shootings" (as had his co-defendants), but nonetheless recognized that Newsome had fully participated in a conspiracy that "was unquestionably serious and undoubtedly troubling," inflicting "deliberate and reckless and harmful"

conduct on the community." J.A. 2066; *see also* J.A. 2066–67 ("[R]egardless of your specific involvement in the shootings themselves, it was clearly reasonably foreseeable to you that engaging in a conspiracy of this type and engaging in the planning associated with such a conspiracy, that retaliation for murder might result in other bloodshed."); J.A. 2073 ("[I]t is clear to the Court . . . that you are the least culpable of the three [defendants.] That's not to say you are not culpable. You are quite culpable, and you engaged in conduct that is incredibly troubling and problematic to the Court, but the Court does not agree [with the Government] that [it] should impose a sentence more than it imposed on Mr. Brooks or Mr. Jenkins."). Second, with respect to the witness tampering charge, the district court plainly took a different view about the weight of the evidence against Newsome—as well as the significance of—his efforts to cover up his earlier crimes. Concluding that "reasonable minds simpl[y] cannot disagree on your consistent brazen efforts to engage in witness tampering," the court described the recorded calls and written requests submitted into evidence at trial in which Newsome "essentially begging various people to alibi you . . . when you knew full well that they could not do so without lying for you." J.A. 2067–68. The court observed that Newsome had been charged with only one count relating to witness tampering, but noted that, in its view, the evidence would have "easily" supported multiple counts of that offense. J.A. 2068. Third and last, the court discussed in some detail numerous additional § 3553(a) factors unrelated to the offense characteristics and his co-defendants' sentences, including Newsome's personal history and criminal history, as well as the need to deter "not just" Newsome but also "others." J.A. 2072.

33

On the record before the Court, we conclude that Newsome has not shown that the sentence the district court imposed was an abuse of discretion. Accordingly, Newsome's sentence is affirmed.

## III.

For the reasons discussed, we affirm Defendants' convictions for conspiracy to commit VICAR murder (Count I), Jenkins' conviction for VICAR attempted murder (Count IV), and Newsome's conviction for witness tampering (Count IX). We also reject Newsome's challenge to his sentence. But we reverse the denial of judgment of acquittal as to Brooks' VICAR attempted murder and related firearms convictions (Counts II and III) and, as a consequence, also vacate his sentence and remand: (1) with instructions to the district court to enter a judgment of acquittal for Brooks as to Counts II and III; and (2) for resentencing as to Brooks only.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*

34